[No. B212975. Second Dist., Div. Six. June 24, 2010.]

EDWIN BAKER, Plaintiff and Appellant, v.
AMERICAN HORTICULTURE SUPPLY, INC., Defendant and Respondent.

COUNSEL

Chad Biggins for Plaintiff and Appellant.

Sheppard Mullin Richter & Hamilton, Moe Keshavarzi; Arnold Bleuel LaRochelle Mathews & Zirbel and Matthew P. Guasco for Defendant and Respondent.

OPINION

**YEGAN, Acting P. J.**—In this first-impression case, we construe the Independent Wholesale Sales Representatives Contractual Relations Act of 1990 (the Act) to avoid an absurd result. (Civ. Code, § 1738.10 et seq.)[1] We resolve this pure question of law to further the express legislative intent to provide "unique protection" to qualifying salespersons. (§ 1738.10.) This case also illustrates the power of the trial court to serve as a "gatekeeper" by exercising its discretion to grant a new trial to prevent what it perceives as a miscarriage of justice.

---

[1] All statutory references are to the Civil Code unless otherwise stated.

Edwin Baker worked as an independent wholesale sales representative for American Horticulture Supply, Inc., respondent. He appeals from the judgment entered upon the trial court's order granting respondent's motion for a directed verdict on his third cause of action, alleging a violation of the Act. The jury returned verdicts in appellant's favor on his remaining causes of action for breach of contract, promissory fraud, and quantum meruit. But the trial court ordered a new trial on the grounds of insufficiency of the evidence, excessive damages, and juror misconduct. Appellant also appeals from that order. We affirm the order granting a new trial and reverse the judgment entered upon the order granting a directed verdict.

### Appellant's Evidence

Appellant's employment career has always been in the retail or wholesale nursery business. In early 2003 he was delivering plants for Pacific Orchid Express and earning about $13.50 an hour. Sheridan Shimp, who worked for respondent, told appellant that respondent wanted to hire a new salesman. Respondent was a "hard goods distributor in the horticultural" industry. Shimp said that the salesman would receive a 10 percent commission on all sales. She also said that Ramon Hernandez, one of respondent's salesmen, earned about $5,000 per month.

Appellant applied for the job and was interviewed by Mahmood and Omead Jafroodi. Mahmood Jafroodi was respondent's owner and president. Omead Jafroodi was respondent's operations manager. After two interviews the Jafroodis said that they would start him on a salary, but he would eventually earn a commission of 10 percent on his sales. They produced a three-page contract that appellant signed. The contract was signed on respondent's behalf by the Jafroodis and Shimp. Appellant was not given a copy of the contract.

The second page of the contract provided that appellant would receive "10% commission on all sales that are at or above 25% gross profit margin, unless otherwise and specifically agreed upon." The contract mentioned nothing about commission on sales with a gross profit margin of less than 25 percent.

The third page of the contract was entitled: "**First Year Compensation Plan Reviewed on a monthly basis and subject to change based on performance.**" Pursuant to the compensation plan, for the first six months appellant would be paid a "base salary" of $2,250 per month. Thereafter,

appellant would be paid $2,250 per month as a "draw against commission." But after the first six months appellant continued to receive the base salary of $2,250 per month because he allegedly "wasn't selling enough to make it on commission."

Starting in January 2005, appellant went on straight commissions. Instead of receiving a monthly draw of $2,250 as provided in the contract, he received a monthly draw of $2,000. On approximately the 10th day of each month after January 2005, respondent paid appellant commissions earned for the preceding month to the extent that the commissions exceeded the $2,000 draw. For example, on February 10, 2005, respondent paid appellant $500 because he had allegedly earned commissions of $2,500 during the preceding January. Respondent never provided appellant with any information as to how his monthly commissions had been calculated.

Appellant gave conflicting testimony concerning the commission he would be entitled to receive on sales with a gross profit margin of less than 25 percent. On the one hand, appellant testified that it was his understanding "from the beginning" that, even if the gross profit margin dropped as low as 10 percent, he would still get his full 10 percent commission unless there was a specific agreement authorizing a commission reduction. No such agreement was ever made. Based on what Shimp and the Jafroodis had told him, appellant expected to earn a 10 percent commission on all sales irrespective of the gross profit margin.

On the other hand, appellant testified that he did not expect to receive a full 10 percent commission on sales with a gross profit margin of less than 25 percent. He "expected to be paid" on these sales, but he "never had any set commission rate in mind." Appellant believed that his commission should be "prorated" so that the "[s]ame percentage off of the 25 percent gross margin should be the same percentage off the 10 percent commission." A few months after appellant started working for respondent, Shimp had told him "that on high-dollar volume sales with low margins, . . . the commission would be adjusted, and . . . Omead [Jafroodi] would pay [him]."

Appellant testified that his total sales for 2005 were $625,000, but for that year he received commissions of only $32,620.33. On February 22, 2006, appellant wrote a letter of resignation stating that he had accepted a sales position with another company at much better pay. Appellant specified three reasons for leaving, one of which was as follows: "I will know how my commissions are calculated."

Prior to his resignation, appellant procured two new clients for respondent: Bell Rock Growers and Watkins Valley Color. Appellant claimed that he was entitled to commissions on sales made by respondent to these two companies after his resignation. This included equipment sales of $110,000 to Watkins Valley Color. Appellant testified that he had "sold the [Watkins Valley Color] program."

Jason Engel, a certified public accountant, calculated appellant's damages and opined as follows: The total commission paid to appellant was $38,497.44. But based on a commission rate of 10 percent on all sales with a gross profit margin of less than 25 percent, appellant was entitled to additional commission of $37,875 for the period from January 1, 2005, through his resignation in February 2006. Engel also applied a 10 percent commission rate to the alleged $110,000 in sales of equipment to Watkins Valley Color. The commission for the equipment sales came to $11,000. Engel then applied a 10 percent commission rate to additional sales to Watkins Valley Color and Bell Rock Growers from March 1, 2006, through October 31, 2007. The commission for these additional sales came to $54,756. Moreover, Engel applied a 10 percent commission rate to estimated sales to Watkins Valley Color and Bell Rock Growers for the 10-month period from November 1, 2007, through August 31, 2008, the approximate date of trial. The commission for this 10-month period was $25,000. Accordingly, through August 31, 2008, Engel opined that the total unpaid commission owed to appellant was $128,631 ($37,875 + $11,000 + $54,756 + $25,000 = $128,631).

Engel assumed that respondent's relationship with Watkins Valley Color and Bell Rock Growers would continue for a three-year period from September 1, 2008, through August 31, 2011. He estimated that appellant's 10 percent commission for each of these three years would be $30,000, or $90,000 for the entire period. Engel discounted the $90,000 over three years to a present value of $82,082. Thus, according to Engel's calculations, the unpaid commission owed to appellant totaled $210,713 ($128,631 (historical commission) + $82,082 (projected commission) = $210,713). Engel estimated that appellant's incidental expenses would be 2 percent of the projected commission figure, or $1,642. Engel subtracted these incidental expenses and arrived at a "Grand Total" of $209,071 in unpaid commission owed by respondent to appellant.

### Respondent's Evidence

Sheridan Shimp worked for respondent as a branch manager. She was present when the sales representative contract between the parties was signed

in July 2003. Shimp gave appellant a copy of the contract, but she did not have him sign a receipt acknowledging that he had received a copy. After the first six months of his employment, appellant did not go on straight commission because "[h]e was struggling to make enough sales to . . . pay for his . . . salary." Shimp never told appellant that he would receive a 10 percent commission on all sales. At some time after appellant was hired, she told him that, on sales with a gross profit margin of less than 25 percent, he would get a commission but it would be less than 10 percent.

Omead Jafroodi did not tell appellant that he would get a 10 percent commission on all sales irrespective of the gross profit margin. Jafroodi "told him that . . . he would need to make a 25 percent gross profit margin if he was expecting a 10 percent commission." Appellant never discussed with Jafroodi an agreement for commission on sales with less than a 25 percent gross profit margin.

Pursuant to the contractual 10 percent commission on sales with a gross profit margin equal to or greater than 25 percent, the total commission due appellant was $31,284.07. Respondent, however, paid appellant $38,497.44, which was $7,213.37 more than he was entitled to receive. The overpayment occurred because Omead Jafroodi would give appellant "something extra for the effort" if he had actually solicited an order with less than a 25 percent gross profit margin. Jafroodi "went beyond what the contract required . . . and . . . gave [appellant] bonuses or additional sums of money in order to help him along, in order to . . . motivate him" and to "develop a . . . long-term relationship." For example, on one sale to Bell Rock Growers the gross profit margin was only 8 percent, but respondent paid appellant a commission of $1,000.

To cover its overhead costs excluding commissions, respondent needed an average gross profit margin of 15 percent. Thus, if respondent paid a 10 percent commission on sales with a gross profit margin of less than 25 percent, it would lose money on those sales. Over half of respondent's 2005 sales had a gross profit margin equal to or greater than 25 percent.

When respondent gave appellant his paycheck, it did not provide him with information on how his commission had been calculated.

Appellant did not initiate the contact with Watkins Valley Color. The owner of the company telephoned respondent and inquired about its products. Omead Jafroodi told appellant about Bell Rock Growers after respondent had established a relationship with the company. Jafroodi "presented . . . the opportunity for Bell Rock to [appellant]." There is no written contract between respondent and Watkins Valley Color or Bell Rock Growers requiring the companies to purchase anything from respondent.

The equipment sales for which appellant claims an $11,000 commission related to a contract between respondent and Sun Gro Horticulture Distribution, Inc. (Sun Gro). The contract was signed in March 2006 after appellant's resignation. Appellant had nothing to do with the negotiation of this contract, which provided for the sale of equipment by Sun Gro, not respondent, to Watkins Valley Color. The contract stated that, "[i]n consideration for the delivery of the Equipment," Watkins Valley Color has "agreed to purchase a minimum volume of Sun [Gro's] Products through [the] Distributor" of the products. The contract designates respondent as the distributor.

Martin Walls testified as follows: He is the owner of Bell Rock Growers. His company purchases pots from respondent. Appellant did not bring the company's account to respondent. Roy Siemens "introduced Bell Rock" to respondent. Appellant serviced the company's account until he resigned. Walls did not want to deal with appellant because he provided poor service and made mistakes. At one point, Walls "contemplated stopping purchasing stuff from [respondent] because [appellant] was [the] sales person." There is no contract requiring Bell Rock Growers to purchase any goods from respondent.

*Jury Verdict*

The jury credited Jason Engel's calculation of damages and returned a special verdict in appellant's favor. On the breach of contract cause of action, the jury found that respondent had failed to pay appellant commissions due under the contract. It awarded him damages of $209,071. On the promissory fraud cause of action, the jury found that respondent had intentionally concealed an "important fact" from appellant with the intent to deceive him. It also awarded him damages of $209,071 on this cause of action. On the quantum meruit cause of action, the jury found that appellant had performed services for respondent's benefit "that were not governed by the contract." The jury determined that the reasonable value of these services was $48,875.

*Trial Court's Reasons for Granting a New Trial*

The trial court granted a new trial on the grounds of insufficiency of the evidence, and excessive damages.[2] It did so with precision, virtually ensuring that its ruling and rationale are not assailable on appeal.[3]

---

[2] The trial judge declared that this was the first time he had granted a motion for new trial in his 10 years on the bench.

[3] The trial court also granted a new trial on the ground of juror misconduct, but we need not consider this ground. An order granting new trial on any valid ground will be affirmed on appeal notwithstanding other grounds. (See *Mazzotta v. Los Angeles Ry. Corp.* (1944) 25 Cal.2d 165, 169 [153 P.2d 338].)

The trial court concluded that respondent had "actually overpaid [appellant] for his sluggish sales over the 14-month commission period." The court noted that the contract "provided [appellant] with a '10% commission on all sales that are at or above 25% gross profit margin, unless otherwise and specifically agreed upon.' " The court stated that respondent's "apparent sin was to pay [appellant] more than his contractual entitlement." The court reasoned: "According to [appellant's] forensic accounting expert, 10% of all sales over 25% gross profit margin for the entire term of [appellant's] sales agency totaled $31,284. Despite that, [appellant] was actually paid $38,497.44 by [respondent], based on 'adjustments' made for [respondent] to compensate [appellant] for sales made on products where the gross profit margin did not rise to the contractual 25% threshold."

The trial court did not credit appellant's testimony that he had procured Watkins Valley Color and Bell Rock Growers as customers for respondent and that he was entitled to an $11,000 commission for the sale of equipment to Watkins Valley Color: "The owner of Bell Rock vehemently denied this; and there was no credible evidence to support [appellant's] claims regarding Valley Color Growers [*sic*, should be 'Watkins Valley Color']. The evidence was clear that [appellant] was not a good salesperson, slow and laconic and prone to mistakes."

The court observed that, before appellant was hired, he "had been told that [respondent's] long-time experienced . . . salespersons were earning about $5000/month." The court was "convinced . . . that a job in which the most experienced salespersons might earn $5,000 per month would [not] entitle [appellant], an inexperienced and relatively incompetent salesman, to a compensatory entitlement of $17,683.46 per month [(i.e., ($38,497.44 already paid + $209,071 compensatory award) divided by 14 months)] . . . ."

### Standard of Review, New Trial

"The standards for reviewing an order granting a new trial are well settled. After authorizing trial courts to grant a new trial on the grounds of '[e]xcessive . . . damages' or '[i]nsufficiency of the evidence,' [Code of Civil Procedure] section 657 provides: '[O]n appeal from an order granting a new trial upon the ground of the insufficiency of the evidence . . . or upon the ground of excessive or inadequate damages, . . . *such order shall be reversed as to such ground only if there is no substantial basis in the record for any of such reasons.*' (Italics added.) Thus, . . . an order granting a new trial under

section 657 'must be sustained on appeal unless the opposing party demonstrates that no reasonable finder of fact could have found for the movant on [the trial court's] theory.' [Citation.] Moreover, '[a]n abuse of discretion cannot be found in cases in which the evidence is in conflict and a verdict for the moving party could have been reached . . . .' [Citation.] In other words, 'the presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the [new trial] order.' [Citation.] [¶] The reason for this deference 'is that the trial court, in ruling on [a new trial] motion, sits . . . as an independent trier of fact.' [Citation.] Therefore, the trial court's factual determinations, reflected in its decision to grant the new trial, are entitled to the same deference that an appellate court would ordinarily accord a jury's factual determinations. [¶] . . . The trial court . . . is in the best position to assess the reliability of a jury's verdict and, to this end, the Legislature has granted trial courts broad discretion to order new trials. The only relevant limitation on this discretion is that the trial court must state its reasons for granting the new trial, and there must be substantial evidence in the record to support those reasons. [Citation.]" (*Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 411–412 [93 Cal.Rptr.2d 60, 993 P.2d 388].)

Our observations in *People v. Andrade* (2000) 79 Cal.App.4th 651, 661 [94 Cal.Rptr.2d 314], are equally apposite in the civil context: "A trial court serves as a 'gatekeeper' on a motion for new trial. It opens the gate only rarely, a testament to the fact that the vast majority of trials . . . are fairly conducted. In these cases, motions for new trial are routinely made, routinely denied, and are routinely affirmed on appeal. In the remaining cases, however, the trial court grants the motion, and we affirm those rulings in the absence of a clear showing of abuse of discretion. [Citation.]"

### The Trial Court Did Not Abuse Its Discretion in Granting a New Trial

On each of the causes of action for breach of contract and promissory fraud, the damages awarded were $209,071. These awards corresponded exactly to Jason Engel's estimate of the amount of damages. Engel's estimate was based on appellant's entitlement to a 10 percent commission on all sales through the date of his resignation with a gross profit margin of less than 25 percent ($37,875), plus a 10 percent commission on $110,000 in sales of equipment to Watkins Valley Color ($11,000), plus a 10 percent commission on sales to Watkins Valley Color and Bell Rock Growers from appellant's resignation through August 31, 2011 ($161,838).

■ The trial court reasonably concluded that appellant was not entitled to a 10 percent commission on sales with a gross profit margin of less than 25 percent. According to Omead Jafroodi, respondent would lose money on such sales if it paid a 10 percent commission. The contract provided for a 10 percent commission only on sales with a gross profit margin equal to or greater than 25 percent, "unless otherwise and specifically agreed upon." Jafroodi testified that appellant had never discussed with him an agreement for commission on sales with less than a 25 percent gross profit margin. Jafroodi denied telling appellant that he would get a 10 percent commission on all sales. As an " 'independent trier of fact' " (*Lane v. Hughes Aircraft Co., supra*, 22 Cal.4th at p. 412), the trial court was free to accept Jafroodi's testimony and reject appellant's. " 'The judge presented with a motion for new trial on [the grounds of insufficiency of the evidence or excessive damages] may review conflicting evidence, weigh its sufficiency, consider credibility of witnesses, reject any testimony believed false and draw any reasonable inferences from the evidence.' " (*Roseboro v. Rawlings Mfg. Co.* (1969) 275 Cal.App.2d 43, 47 [79 Cal.Rptr. 567].)

Moreover, appellant's testimony on the commission rate was conflicting. On the one hand, he testified that he did not expect to receive a full 10 percent commission on sales with a gross profit margin of less than 25 percent. He believed that the commission on such sales should be "prorated." On the other hand, appellant testified that, based on what Shimp and the Jafroodis had told him, he expected to earn a 10 percent commission on all sales irrespective of the gross profit margin.

The trial court also reasonably concluded that appellant was not entitled to a 10 percent commission of $161,838 on sales to Watkins Valley Color and Bell Rock Growers from his resignation through August 31, 2011. No evidence was presented that the gross profit margin on such sales would be equal to or greater than 25 percent. Furthermore, there was no assurance that these companies would continue to do business with respondent through August 31, 2011. Martin Walls, the owner of Bell Rock Growers, testified that he buys pots from respondent because of the price and that he is not contractually bound to purchase anything from respondent.

In addition, the trial court reasonably rejected appellant's claim that he was entitled to commissions on sales to Watkins Valley Color and Bell Rock Growers after his resignation because he had procured these companies as customers for respondent. Walls, the owner of Bell Rock Growers, testified that appellant had not procured his company's account. According to Walls,

Roy Siemens "introduced Bell Rock" to respondent. As to Watkins Valley Color, Omead Jafroodi testified that appellant had not initiated the contact with that company. According to Jafroodi, the owner of Watkins Valley Color telephoned respondent and inquired about its products. The testimony of Walls and Jafroodi constituted substantial evidence in support of the trial court's finding that appellant had not procured Watkins Valley Color and Bell Rock Growers as customers for respondent.

Furthermore, the trial court reasonably concluded that appellant was not entitled to a 10 percent commission on $110,000 in alleged sales of equipment to Watkins Valley Color. Omead Jafroodi testified that the alleged sales related to a contract between respondent and Sun Gro. The contract was signed in March 2006 after appellant's resignation, and appellant had nothing to do with its negotiation. Moreover, the contract provided for the sale of equipment by Sun Gro, not respondent, to Watkins Valley Color.

As to the quantum meruit cause of action, the jury awarded appellant damages of $48,875. This amount is exactly equal to Engel's figures of a 10 percent commission on all sales through the date of appellant's resignation with a gross profit margin of less than 25 percent ($37,875) plus a 10 percent commission on the $110,000 in alleged sales of equipment to Watkins Valley Color ($11,000). For the reasons explained above, the trial court reasonably concluded that these damages were also excessive.

*Third Cause of Action (§ 1738.10 et seq.)*

The trial court granted respondent's motion for a directed verdict on appellant's third cause of action for violation of the Act. (§ 1738.10 et seq.) Pursuant to section 1738.13, respondent was required to "enter into a written contract" with appellant (*id.*, subd. (a)), and the contract was required to include the following information: "(1) The rate and method by which the commission is computed. [¶] (2) The time when commissions will be paid. [¶] (3) The territory assigned to the sales representative. [¶] (4) All exceptions to the assigned territory and customers therein. [¶] (5) What chargebacks will be made against the commissions, if any." (*Id.*, subd. (b).) Respondent was further required to give a copy of the contract to appellant and assure that he signed "a receipt acknowledging receipt of the signed

contract." (*Id.*, subd. (c).) Moreover, when respondent paid appellant his commissions, it was required to provide him with written information and documentation showing how the commissions had been calculated. (*Id.*, subd. (d).) Respondent concedes that it failed to comply with section 1738.13 in certain respects.[4]

Section 1738.15 of the Act provides: "A manufacturer, jobber, or distributor who willfully fails to enter into a written contract as required by this chapter or willfully fails to pay commissions as provided in the written contract shall be liable to the sales representative in a civil action for treble the damages proved at trial." Appellant's second amended complaint alleges that respondent's "violations of the Act were willful." Appellant therefore "prays for the court to treble the damages awarded by the jury."

### *Trial Court's Ruling (§ 1738.10 et seq.)*

The trial court found that respondent had "[c]learly" failed to comply "with the statute [(section 1738.13)] in multiple ways." But the court granted respondent's motion for a directed verdict because "there's no evidence whatsoever of willfulness of violating the statutory requirements." The court interpreted section 1738.15 of the Act as allowing damages only for willful violations.

Judgment was subsequently entered in respondent's favor on the third cause of action. Pursuant to section 1738.16, the judgment awards attorney fees and costs to respondent as the prevailing party. Section 1738.16 provides: "In a civil action brought by the sales representative pursuant to this chapter, the prevailing party shall be entitled to reasonable attorney's fees and costs in addition to any other recovery."[5]

---

[4] Respondent concedes that it "failed to comply with Section 1738.13 in the following respects concerning the written contract it provided to [appellant]: ¶ 1. The written contract omits the 'method by which the commission is computed.' (subd. (b)(1).) ¶ 2. The contract does not specify the precise geographical territory assigned to [appellant]. (subd. (b)(3).) ¶ 3. The contract does not specify all exceptions to the territory. (subd. (b)(4).) ¶ 4. The contract does not discuss the subject of charge-backs. (subd. (b)(5).) ¶ 5. Although [appellant] signed and received a copy of the written contract, [respondent] did not obtain [appellant's] separate signed acknowledgment of his receipt of the contract. (subd. (c).)"

[5] Respondent has moved to dismiss the appeal from the judgment entered upon the trial court's order granting a directed verdict. Respondent argues that the order can be reviewed only on appeal from a final judgment, and there is no final judgment because the trial court granted a new trial. Respondent asserts: "[I]t [(the judgment on the directed verdict)] is appealable after judgment is entered following a new trial on the remaining causes of action. At that time, the judgment on the directed verdict will be merged with the judgment on the remaining causes of action, thus becoming one final judgment subject to the right of appeal."

We disagree. "Where an aggrieved party appeals from a new trial order, then the entire judgment is subject to appellate review at that time. [Citation.] 'One effect of an order granting

## Standard of Review, Directed Verdict

"A directed verdict is . . . subjected to de novo appellate review. '[T]he power of the court to direct a verdict is absolutely the same as the power of the court to grant a nonsuit.' [Citation.] 'A motion for a directed verdict "is in the nature of a demurrer to the evidence, and is governed by practically the same rules, and concedes as true the evidence on behalf of the adverse party, with all fair and reasonable inferences to be deduced therefrom." ' [Citation.]" (*Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195, 210 [77 Cal.Rptr.2d 660], fn. omitted.) " 'A defendant is entitled to a nonsuit [or directed verdict] if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor. [Citation.] "In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. . . ." [¶] In reviewing a grant of nonsuit [or directed verdict], we . . . will not sustain the judgment " 'unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law.' " ' [Citation.]" (*Colbaugh v. Hartline* (1994) 29 Cal.App.4th 1516, 1521 [35 Cal.Rptr.2d 213].)

## Willfulness and Section 1738.10 et seq.

Appellant contends: "[P]roof of 'willfulness' is not a prerequisite to prevailing under Civil Code § 1738.10, et. seq. Proving there was a 'willful' failure to pay commissions or willful failure to enter a written contract as set forth in . . . § 1738.15 is only required for an award of treble the damages proven at trial."

■ We agree with appellant. We reject respondent's theory that the Legislature intended to provide a monetary remedy only for willful violations of the statutory scheme, leaving nonwillful violations without any remedy whatsoever. Respondent's theory is predicated on a literal reading of the statutory scheme which does not expressly provide for simple compensatory damages in the nonwillful setting. This lacuna requires us to construe the statutory scheme. We are "loathe" to "add" language to the statutory scheme

a new trial is, of course, to vacate the judgment; however, when an appeal is taken from such an order the vacating effect is suspended, and the judgment remains effective for the purpose of an appeal from the judgment.' [Citation.] . . . [¶] . . . Since [appellant has] properly appealed from the new trial order, the judgment . . . is subject to review in this appeal." (*Beavers v. Allstate Ins. Co.* (1990) 225 Cal.App.3d 310, 330 [274 Cal.Rptr. 766].) Accordingly, respondent's motion to dismiss the appeal from the judgment on the directed verdict is denied.

except in the extreme case. (*People v. Buena Vista Mines, Inc.* (1996) 48 Cal.App.4th 1030, 1034 [56 Cal.Rptr.2d 21], and cases cited.) This is an extreme case and we explain why this legislative drafting omission must be corrected.

■ A sales representative who has suffered damages as a result of a nonwillful violation of the Act should not be precluded from obtaining any recovery under the Act. Surely, the Legislature did not intend to pass a toothless statute. Otherwise, if a sales representative sued his manufacturer but was able to prove only a nonwillful violation, he would be required to pay the violator's reasonable attorney fees and costs since the violator would be the prevailing party pursuant to section 1738.16. This is the antithesis of "unique protection" for the intended salesperson. (§ 1738.10.) The Legislature did not intend such an absurd result that would have a chilling effect on the willingness of sales representatives to sue for damages under the Act.[6]

■ " ' " 'It is a settled principle of statutory interpretation that language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend.' " ' [Citations.] '. . . Where more than one statutory construction is arguably possible, our "policy has long been to favor the construction that leads to the more reasonable result. [Citation.]" [Citation.] This policy derives largely from the presumption that the Legislature intends reasonable results consistent with its apparent purpose. [Citation.]' " (*Commission on Peace Officer Standards & Training v. Superior Court* (2007) 42 Cal.4th 278, 290 [64 Cal.Rptr.3d 661, 165 P.3d 462]; see also *Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 27 [109 Cal.Rptr.3d 329, 230 P.3d 1117].)

The Act's legislative history supports our construction of the statutory scheme. The Act was added to the Civil Code in 1990 by Assembly Bill No. 3456 (1989–1990 Reg. Sess.). (Stats. 1990, ch. 964, § 1, p. 4054.) As amended in the Assembly on April 30, 1990, the bill provided: "A manufacturer, jobber or distributor who fails to enter a written contract as required by this chapter shall be liable to the sales representative in a civil action for treble the damages proved at trial." There was no requirement that the failure be willful. As amended on April 30, 1990, the bill also provided: "A manufacturer, jobber, or distributor who fails to pay commissions as provided in the written contract shall be liable to the sales representative in a civil action for twice the damages proved at trial." Again, a willful failure was not required.

A staff analysis by the Assembly Committee on the Judiciary criticized these provisions because they applied irrespective of whether a violation of

---

[6] Appellant aptly observes: "In effect, under the trial court's view, [appellant's] 'reward' for proving that [respondent] violated the statute was to punish [appellant] by making him pay the attorney's fees incurred by the person who violated the law."

the Act was willful. In determining legislative intent, we may consider bill analyses prepared by the staff of legislative committees. (*People v. Benson* (1998) 18 Cal.4th 24, 34, fn. 6 [74 Cal.Rptr.2d 294, 954 P.2d 557].) The Assembly Committee on the Judiciary staff analysis included the following excerpt: "Committee staff has been informed that the author [of Assembly Bill No. 3456] will offer amendments in Committee which will strike provisions which provide damage for twice the amount of damages proven at trial. Instead the bill will provide that an m/j/d [(manufacturer, jobber, or distributor)] who fails to enter a contract or fails to pay commission to a sales representative as provided in such a contract shall be liable for three times the damages proved at trial. [¶] Even if the author's amendments are adopted, as drafted, the bill appears to provide that an m/j/d will be liable for treble damages for any failure to comply with the requirements of the bill. Does the author intend that treble damages be awarded if a failure was nonwillful or technical in nature? Should not the bill *limit* treble damage liability for 'willful' failure to comply with the bill's provisions?" (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 3456 (1989–1990 Reg. Sess.) as amended Apr. 30, 1990, p. 3, italics added.)

In its analysis, the Assembly Committee on the Judiciary staff recommended that treble damages be *limited* to willful violations of the bill, and that regular compensatory damages be awarded for nonwillful or technical violations. The author apparently accepted the committee staff's recommendation. As amended in the Assembly on May 16, 1990, Assembly Bill No. 3456 (1989–1990 Reg. Sess.) provided for treble damages for a willful failure to enter into a written contract as required by the bill or a willful failure to pay commissions as provided in the written contract. There is no indication that, by this amendment, the Legislature intended to immunize a nonwillful violation of the Act. This would frustrate the intent, as expressed in the committee staff analysis, that treble damages liability be *limited* to a willful failure to comply with the bill's provisions, and that regular compensatory damages be awarded for nonwillful or technical violations.

### Sufficiency of the Evidence

██ Here, the evidence is sufficient to permit a jury to find that respondent committed a nonwillful violation of the Act. But even if a willful violation were required for an award of regular compensatory damages under the Act, the trial court would still have erred in granting respondent's motion for a directed verdict. " 'In civil cases, the word "willful," as ordinarily used in courts of law, does not necessarily imply anything blamable, or any malice or wrong toward the other party, or perverseness or moral delinquency, but

merely that the thing done or omitted to be done was done or omitted intentionally. It amounts to nothing more than this: That the person knows what he is doing, intends to do what he is doing, and is a free agent.' [Citations.]" (*Ibrahim v. Ford Motor Co.* (1989) 214 Cal.App.3d 878, 894 [263 Cal.Rptr. 64], fn. omitted.) The application here of the ordinary definition of "willful" is supported by the judicial construction of Labor Code section 203, subdivision (a), which provides in relevant part: "If an employer *willfully* fails to pay . . . any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days." (Italics added.) "The settled meaning of 'willful,' as used in section 203, is that an employer has intentionally failed or refused to perform an act which was required to be done. [Citations.] '[T]he employer's refusal to pay need not be based on a deliberate evil purpose to defraud workmen of wages which the employer knows to be due.' [Citations.]" (*Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1201 [78 Cal.Rptr.3d 572].)[7]

In view of the legal definition of "willful," the evidence, if credited by a new jury, is sufficient to support a finding that respondent willfully failed to enter into a written contract as required by the Act. Section 1738.13, subdivision (b)(1), provides that the written contract must include "[t]he rate and method by which the commission is computed." Viewing the evidence in the light most favorable to appellant and giving him the benefit of every reasonable inference, a jury could reasonably conclude that respondent had intentionally failed to include in the written contract "[t]he rate and method" by which appellant's commission would be calculated. (*Ibid.*)

The contract, which was prepared by respondent, was silent as to the commission on sales with a gross profit margin of less than 25 percent. It is reasonable to infer that respondent did not expect appellant to work for free on such sales, especially since they constituted a substantial portion of respondent's total sales. It is also reasonable to infer that respondent intentionally, rather than inadvertently, omitted from the contract the commission

---

[7] The courts, however, have recognized that a finding of "willfulness" within the meaning of Labor Code section 203 may be negated by a reasonable, good faith belief in a legal defense to a wage claim. (*Amaral v. Cintas Corp. No. 2, supra,* 163 Cal.App.4th at p. 1201; *Armenta v. Osmose, Inc.* (2005) 135 Cal.App.4th 314, 325 [37 Cal.Rptr.3d 460]; *Barnhill v. Robert Saunders & Co.* (1981) 125 Cal.App.3d 1, 8–9 [177 Cal.Rptr. 803]; see also Cal. Code Regs., tit. 8, § 13520.) Accordingly, we conclude that a finding of a willful failure "to pay commissions as provided in the written contract" (§ 1738.15) may be negated by a reasonable, good faith belief in a legal defense to a commissions claim.

rate on such sales because it wanted to have flexibility in determining that rate. Omead Jafroodi utilized this flexibility when he gave appellant "something extra for the effort" if he had actually solicited an order that was under the 25 percent gross profit margin. Shimp referred to this flexibility when, according to appellant, she told him after he had started work "that on high-dollar volume sales with low margins, . . . the commission would be adjusted, and . . . Omead [Jafroodi] would pay [him]."[8]

We reject respondent's contention in its petition for rehearing that "conduct violating the Act is willful only if the manufacturer, jobber or distributor knows of its obligations but intentionally declines to fulfill them." The knowledge requirement would be difficult to prove and would encourage manufacturers to remain ignorant of their obligations under the Act. This would frustrate the legislative intent to provide "unique protection" to independent wholesale sales representatives. (§ 1738.10.) But a manufacturer's failure to comply with the Act would not be willful if the manufacturer proved that its failure was "the result of a good faith and reasonable belief the facts imposing the statutory obligation were not present." (*Kwan v. Mercedes-Benz of North America, Inc.* (1994) 23 Cal.App.4th 174, 185 [28 Cal.Rptr.2d 371].) For example, a failure to comply would not be willful if the manufacturer reasonably and in good faith believed that a person did not qualify as a "wholesale sales representative" within the meaning of the Act. This interpretation "will not vitiate the intended deterrent effect of the [treble damages provision]." (*Ibid.*)

---

[8] Immediately after the trial court granted respondent's motion for a directed verdict in its favor on appellant's third cause of action, appellant moved for a partial "directed verdict [in his favor] . . . on violation of the act." The motion was based on the trial court's finding that "there was noncompliance with the statute [(§ 1738.13)] in multiple ways." Appellant contends that the trial court erroneously failed to grant his motion for a partial directed verdict.

We need not consider the merits of appellant's motion because it was not timely. After the parties had completed the presentation of all of their evidence, the trial court asked if there were "any motions." Respondent declared that it was moving for a directed verdict on three causes of action. Appellant remained silent. Earlier that day, appellant had filed a brief in which it urged the court to "let the issues go to the Jury and let the Jury sort out the facts." Appellant delayed moving for a partial directed verdict in his favor on the third cause of action until after the trial court had granted respondent's motion for a directed verdict in its favor on the entirety of the third cause of action. At that point, appellant's motion could not have been granted because the third cause of action had been resolved against him. The reporter's transcript shows that appellant's motion was merely an afterthought to the granting of respondent's motion:

"THE COURT: All right. Court grants [respondent's] motion for directed verdict on the statutory count. There's no evidence of willfulness of violation of the statute. Clearly, there was noncompliance with the statute in multiple ways, but there's no evidence whatsoever of willfulness of violating the statutory requirements.

"[APPELLANT'S COUNSEL]: Plaintiff moves for directed verdict then also on violation of the act?"

*Disposition*

The judgment entered upon the order granting a directed verdict on appellant's third cause of action is reversed. The order granting a new trial is affirmed. The parties shall bear their own costs on appeal.

Coffee, J., and Perren, J., concurred.

A petition for a rehearing was denied July 21, 2010, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied October 13, 2010, S185034.