Filed 6/6/18 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| STRATEGIC CONCEPTS, LLC,<br><br>    Plaintiff, Cross-defendant and Respondent,<br><br>v.<br><br>BEVERLY HILLS UNIFIED SCHOOL DISTRICT,<br><br>    Defendant, Cross-complainant and Appellant. | 2d Civil No. B264478<br>(Super. Ct. No. BC420456)<br>(Los Angeles County)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on May 10, 2018, be modified as follows:

1. On page 2, after the word (and heading) "FACTS," insert footnote 2 to read:

In her petition for rehearing, Christiansen complains that our statement of facts may prejudice her in a possible retrial.  Her brief on appeal did not contain a statement of facts.  The facts we adduce here were derived from the record.  Nevertheless, Christiansen need not be concerned

because this is an unqualified reversal. "The effect of an unqualified reversal ('the judgment is reversed') is to vacate the judgment, and to leave the case 'at large' for further proceedings as if it had never been tried, and as if no judgment had ever been rendered." (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 869, p. 928, and the plethora of cases cited.)

2. On page 8, in the second sentence in the last paragraph, the name "Dennis Wolliver" is changed to "Dannis Woliver Kelley."

3. On page 8, in the third sentence in the last paragraph, the phrase "from Wolliver's office" is changed to "from Dannis Woliver Kelley's office."

4. On page 19, the last paragraph is changed to read: "The judgment is reversed. Costs are awarded to appellant."

There is no change in the judgment.

Respondent's petition for rehearing is denied.

Filed 5/10/18 (unmodified version)
# CERTIFIED FOR PUBLICATION

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION SIX

| | |
|---|---|
| STRATEGIC CONCEPTS, LLC,<br><br>  Plaintiff, Cross-defendant and Respondent,<br><br>v.<br><br>BEVERLY HILLS UNIFIED SCHOOL DISTRICT,<br><br>  Defendant, Cross-complainant and Appellant. | 2d Civil No. B264478<br>(Super. Ct. No. BC420456)<br>(Los Angeles County) |

A school district employee persuaded the district to convert her position from employee to independent contractor. She formed a limited liability company (LLC). The result: she was no longer an employee to whom the district paid $113,000 per year; she was now the sole owner of an LLC to which the district paid more than $1.3 million a year. Later she persuaded the district to award her LLC a $16 million no-bid contract. The district later declared the contracts void in violation of Government Code

section 1090,[1] prohibiting conflicts of interest in the making of public contracts, and section 4525 et seq., requiring competitive bidding for certain public contracts.

The LLC sued the district for breach of contract and the district cross-complained to recover money paid under the alleged void contracts.

The trial court instructed the jury that the LLC's contracts did not violate section 1090 on the theory the statute does not apply to independent contractors. The court did not instruct on the competitive bidding statutes. It also concluded that a "termination for convenience" clause in the contract did not limit damages. The jury awarded millions in damages to the LLC.

We reverse. Section 1090 applies to independent contractors. The trial court misinterpreted section 1090 and erred in not instructing on the competitive bidding statutes. The contract also limits the LLC's damages.

*FACTS*

Karen Christiansen was employed as director of planning and facilities for the Beverly Hills Unified School District (District). Among her duties Christiansen administered the planning, construction, and maintenance of the District's school facilities. She received a salary of $113,000 per year plus a $150 per month automobile allowance. Her written employment agreement ran from February 2005 through June 2007.

In 2006, Christiansen lobbied District officials to change her position from an employee to a consultant. A former member of the Board of Education (Board) testified, "Ms. Christiansen lobbied hard to move from the director of facilities and planning

_____

[1] All statutory references are to the Government Code unless otherwise stated.

to consulting status." In June 2006, Christiansen entered into a new three-year contract with the District terminating her status as an employee and naming her a consultant.

The new contract, however, did not change her duties. The contract provided in part: "It is the intent of The District and Karen Christiansen that the transition be seamless as far as the operations of The District and the responsibilities of Karen Christiansen are concerned and that Karen Christiansen continue to have the same responsibilities she had as the Director of Planning and Facilities except for those duties and responsibilities which would be precluded due to her change in status from employee to consultant."

The contract further provided: "The District shall provide office space, office equipment and supplies in an amount, quantity and quality as is currently being provided to Consultant."

Pursuant to the contract, Christiansen's two minor children were considered children of a District employee for the purpose of attending school in the District. Christiansen was allowed to continue her use of the District's email. The new District Superintendant Kari McVeigh believed for a time that Christiansen was a District employee and a member of her staff.

The contract set Christiansen's compensation at $160 per hour with a maximum compensation of $170,000 per year. Compensation could not exceed the maximum without prior written recommendation by the District staff and prior written approval by the Board.

Christiansen formed Strategic Concepts, LLC (Strategic), of which she was the sole owner. In early 2007, Christiansen assigned her consulting contract to Strategic.

3

*Payments Under the Contract*

McVeigh and Assistant Superintendant of Business Services Cheryl Plotkin were required to review and approve Strategic's invoices. McVeigh described her relationship with Christiansen as "friendly, friends." Plotkin frequently socialized with Christiansen. She attended parties at Christiansen's home. They went on two pleasure trips. At Plotkin's request, Christiansen obtained tickets to a show in Las Vegas for Plotkin and her husband. They reimbursed her. Christiansen hired Plotkin's daughter to work for Strategic.

In spite of the $170,000 per annum contract limitation, Strategic's invoices were approved and paid in the following amounts: $253,520 in 2006; $1,313,035 in 2007; and $1,390,804 in 2008. No one from the District alerted the Board about the over-payments. The invoices simply appeared on the Board's "consent calendar"; that is, items that the Board does not usually review on an individual basis.

When Christiansen discovered her contract and payments were being questioned by the District's Citizens' Oversight Committee, she emailed Plotkin: "Let's just say that the contract was developed by your attorney . . . . Please shut this down fast."

*2008 New Contract*

In June 2008, with one year left on her existing contract, Christiansen negotiated a new contract. She testified that McVeigh wanted a new contract because the existing contract did not contain a "termination for convenience" clause; that is, a clause that would allow the District to terminate her contract without cause.

Christiansen's friend was the District's counsel, David Orbach, and his partner, David Huff. Christiansen, Orbach and

4

Huff were among a group of friends who often met for drinks after work.  In emails Orbach referred to Christiansen as "my queen" and she referred to him as "my prince."  Christiansen sent Orbach and Huff an unsolicited picture of herself in a black bikini.  The attorneys and Christiansen exchanged a number of emails containing sexual innuendo.

On June 3, 2008, the District and Strategic entered into a new consulting contract.  The contract terminated on June 30, 2009.  The contract it replaced provided for maximum compensation of $170,000 per annum.  The new contract provided for compensation per an hourly rate schedule attached as exhibit B to the contract.  In addition, the contract provided for a retroactive payment in an amount not to exceed $950,000 for services performed between January 1 and June 30, 2008.  The compensation would be updated annually as approved by the Board.

The new contract contained a "termination for convenience" provision.  The provision stated in part:  "This AGREEMENT may be terminated without cause by DISTRICT upon sixty (60) days' written notice to CONSULTANT.  In the event of a termination without cause, the DISTRICT shall pay CONSULTANT for all SERVICES performed and all expenses incurred under this AGREEMENT supported by documentary evidence, including payroll records, and expense reports up until the date of notice of termination plus any sums due the CONSULTANT for BOARD approved extra SERVICES. . . .  In addition, CONSULTANT will receive a termination fee that shall be the equivalent of one (1) month of payment to CONSULTANT for SERVICES based on the average of the valid invoiced amounts from the three (3) months preceding termination

5

("Termination Fee')." The contract was later amended to require 120 days' notice of termination, and the one-month termination fee was amended to three months' payment.

The new contract further provided in part: "In the event a termination for cause is determined to have been made wrongfully or without cause, then the termination shall be treated as a termination for convenience . . . , and CONSULTANT shall have no greater rights than it would have had if a termination for convenience had been effected in the first instance. No other loss, cost, damage, expense or liability may be claimed, requested or recovered by CONSULTANT."

McVeigh signed the contract on behalf of the District. The contract was approved by the Board.

*Advocation for School Bond*

In Spring 2008, Christiansen advocated for a new school bond issue. She pressed the District to conduct a survey to determine whether voters would favor it. She said the survey could be done without cost to the District.

Christiansen sought McVeigh's permission to address the Board about the bond. McVeigh denied her request. She told Christiansen that the recommendation for a bond issue should come from the superintendent; if it comes from the project management company, it will look like the company is only trying to get business.

Nevertheless, Christiansen persisted. She procured a draft community survey from her bond underwriter on her own initiative. She repeatedly asked McVeigh to present it to the Board. McVeigh resisted.

Christiansen presented McVeigh with her underwriter's bond scenarios. According to the underwriter, the District could

6

issue bonds up to $300 million. Christiansen told McVeigh that if the Board approved the survey at its July 2008 study session, there would be enough time to place the issue on the November 2008 ballot.

Eventually Christiansen got her way. She presented her idea for the bonds at the Board's July 2008 study session. The Board approved the bond survey and approved placing the bond issues on the November 2008 ballot. After the meeting, the bond underwriter emailed Christiansen, "You choreographed the meeting last night perfectly!"

Later in discussing whether to include agreements with the underwriter and bond counsel in the draft Board resolution, Christiansen emailed McVeigh, "Can we include my company's name too? I'd hate to do all this work and then be pushed aside."

At the same Board meeting, Christiansen proposed that the District retain Strategic for program and project management of the projects to be funded by the bond. Christiansen proposed an amendment to the 2008 contract that Strategic be paid $6 million (2 percent of the $300 million project budget) for program management and $10.125 million (4.5 percent of the construction value of $225 million) for project management (hereafter "contract amendment").

The Board's discussion of Christiansen's proposed contract amendment was described by the District's attorney Huff as "very contentious." Huff said that both McVeigh and Christiansen were unhappy that Christiansen's proposed fees were debated. The Board tabled the matter.

After the meeting, Christiansen emailed McVeigh. Christiansen stated that she had been "breaking [her] butt" for the District, and now her competitors would have an opportunity

7

to obtain the management contract.  Christiansen claimed she had been discounting her fees to the District and threatened to stop the discount.

At a Board meeting in August 2008, Plotkin recommended that the Board approve Christiansen's contract amendment.  The Board approved the contract amendment three-to-one with one abstention.  No other bids were taken.

### Bond Measure Passes and Strategic Bills

On November 8, 2008, the voters passed the $334 million bond measure.  On November 20, 2008, Christiansen sent the first invoice for program and project management services in the amount of $231,414.24.  Between November 2008 and August 2009, Strategic collected more than $2,000,000 in management fees even though no specific project had been approved.

### Investigation

McVeigh retired in November 2008.  Jerry Gross became the new interim superintendent.  Gross became concerned about the amount of money being paid to Strategic without there being an approved project.

The Board became aware that Christiansen was receiving "a lot of money."  Board member Myra Laurie testified that when Gross told her how much Christiansen was receiving, she was shocked and became physically ill.  Laurie called Christiansen. Christiansen admitted she "might have gotten ahead of [herself]."

### Contract Terminated

The Board met within 24 hours to consider the matter.  The Board retained a new attorney, Dennis Wolliver, to advise it.  On August 13, 2009, an attorney from Wolliver's office wrote Christiansen's attorney advising him that Strategic's contracts with the District are void under section 1090 for conflicts of

interest.  The same day Strategic was ordered by the District to vacate the District's premises.

*Criminal Prosecution*

Christiansen was prosecuted for a criminal violation of section 1090.  A jury found her guilty.  She was sentenced to more than four years in prison and ordered to pay the District $3.5 million in restitution.

Division 1 of this court reversed the conviction in *People v. Christiansen* (2013) 216 Cal.App.4th 1181.  The court reasoned that for the purposes of criminal law, section 1090 did not apply to independent contractors.  The court declined to decide the scope of section 1090 as applied to civil actions.

*Instant Action*

Christiansen and Strategic brought an action against the District seeking a declaration that the 2008 contract and contract amendment are not void under California's conflict of interest laws, including section 1090, or due to the failure to comply with public contracting laws.  Christiansen and Strategic later amended the complaint to add a cause of action for breach of contract.

The District cross-complained alleging that Christiansen was at all times an employee of the District; that she violated section 1090 et seq. on conflicts of interest; and that she violated section 4525 et seq. for failure to comply with the competitive bidding process.

Prior to trial, the trial court ruled that section 1090 does not apply.  The ruling was based on *People v. Christiansen*, *supra*, 216 Cal.App.4th 1181.  The court granted judgment of nonsuit on the District's cross-complaint against Strategic and Christiansen.

When the nonsuit was granted, Christiansen withdrew as a plaintiff, leaving only Strategic.

The trial court instructed the jury: "On August 13th, 2009, the Beverly Hills Unified School District notified Strategic Concepts that it was declaring their contracts with the school district void for claimed violations of Government Code section 1090. However, the court has determined in this case, and you are instructed, that [Strategic's] contracts did not violate Government Code section 1090 and that the claimed violation of that statute . . . was not a legally valid ground for voiding the contracts."

The jury awarded Strategic general contract damages of $7,710,509 based on $16,125,000 in program and project management fees less overhead and payments received. The jury also awarded Strategic $6 million in special contract damages based on the District's actions destroying the value of Strategic.

The trial court awarded Strategic $4,310,660 in prejudgment interest pursuant to Civil Code section 3287, subdivision (b), and $2.3 million contractual attorney fees. The total judgment is $20,321,169.

## DISCUSSION

### I

The District contends the trial court erred in instructing that Strategic's contracts did not violate section 1090 and that violating the statute is not a legally valid ground for voiding the contracts.

The trial court's instruction is the equivalent of a directed verdict or judgment of nonsuit in favor of Christiansen and against the District. In reviewing the directed verdict or judgment of nonsuit against the District, we view the evidence in

10

a light most favorable to the District and against Christiansen, resolving all presumptions, inferences and doubts in favor of District. (*Baker v. American Horticulture Supply, Inc.* (2010) 186 Cal.App.4th 1059, 1072.) We affirm only if such a judgment is required as a matter of law. (*Ibid.*)

Section 1090, subdivision (a) provides in part: "Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members. Nor shall state, county, district, judicial district, and city officers or employees be purchasers at any sale or vendors at any purchase made by them in their official capacity."

The trial court's instruction was based on its determination that as a matter of law section 1090 does not apply because Christiansen was an independent contractor and not an officer or employee of the District. The instruction was based on *People v. Christiansen, supra*, 216 Cal.App.4th 1181. But while this appeal was pending, our Supreme Court expressly disapproved *Christiansen* in *People v. Superior Court (Sahlolbei)* (2017) 3 Cal.5th 230, 247.

In *Sahlolbei*, the defendant, a surgeon, was an independent contractor of a public hospital. He sat on an independent committee that advised the hospital's board on matters including physician hiring. He pressured the hospital into giving another doctor a contract in which he (the defendant) had an interest. The People charged the defendant with violating section 1090. The trial court dismissed under *Christiansen* because the defendant was an independent contractor. A divided Court of Appeal affirmed the dismissal. Our Supreme Court reversed.

11

In reversing, our Supreme Court concluded the term "employees" as used in section 1090 is "intended to include outside advisors with responsibilities for public contracting similar to those belonging to formal employees, notwithstanding the common law distinction between employees and independent contractors." (*People v. Superior Court (Sahlolbei)*, *supra*, 3 Cal.5th at p. 237.) The focus is on the substance of the challenged transaction, disregarding the technical relationship of the parties. (*Id.* at p. 239.) The court cited with approval cases applying section 1090 to independent contractors in the civil context. (*Id.* at p. 238; see *California Housing Finance Agency v. Hanover/California Management & Accounting Center, Inc.* (2007) 148 Cal.App.4th 682, 693 [independent contractor attorney covered by section 1090]; *Hub City Solid Waste Services, Inc. v. City of Compton* (2010) 186 Cal.App.4th 1114, 1125 [independent consultant advised city to hire his firm]; *Davis v. Fresno Unified School Dist.* (2015) 237 Cal.App.4th 261, 300 [independent consultant awarded construction contract].)

The court in *Sahlolbei* referred to *Christiansen* as illustrating why section 1090 must be construed as applying to independent contractors. The court stated: "The perverse consequences of exempting independent contractors from section 1090 provide another reason against ascribing to the Legislature such an intent. An official 'could manipulate the employment relationship to retain "official capacity" influence, yet avoid liability under section 1090' . . . , a scenario illustrated by the facts of *Christiansen*. Christiansen was initially employed directly by the school district. . . . Two years later, she entered into a new contract with the district under which she was treated as an independent contractor, although she continued to perform

12

the same duties. . . . Her alleged malfeasance occurred during the new contract. . . . As a result, she was able to escape liability for misspending the public's money in large part because at the time of her misconduct, she provided her own insurance . . . ; if the exact same conduct had occurred under the old contract, she could have been liable. The *Christiansen* court did not explain why the Legislature would have intended this result." (*People v. Superior Court (Sahlolbei)*, *supra*, 3 Cal.5th at p. 243, citations omitted.)

Christiansen argues that she did not violate section 1090 because she was simply negotiating her own compensation. (Citing *Campagna v. City of Sanger* (1996) 42 Cal.App.4th 533, 539-540.) Of course, a District employee may negotiate a reasonable salary without violating section 1090. But Christiansen went far beyond that.

Christiansen used her position of trust as an employee to ingratiate herself with the District's administrators. She "lobbied hard" to move from an employee to independent contractor. As a result, she entered into a contract that transformed her from an employee earning $113,000 per year to an independent contractor earning over $1.3 million per year, doing the same work from the same office in the District's headquarters. Then she used her influence with the District to obtain a $16 million no-bid contract to administer the District's new bond fund. Using a position of public trust or influence to obtain such contracts is a clear violation of section 1090. (See *Hub City Solid Waste Services, Inc. v. City of Compton*, *supra*, 186 Cal.App.4th 1114 [where city's consultant persuaded city to contract with consultant's corporation, contract void as violating section 1090].) There is a reason why our Supreme Court in *Sahlolbei* used the facts of

13

Christiansen's case to illustrate why section 1090 applies, not why she was simply negotiating her own compensation.

Christiansen raises a number of arguments in her reply brief under the heading "Statement of the Case." The arguments are raised in a summary manner without citation to authority. We could treat the arguments as waived. (See *Roe v. McDonald's Corp.* (2005) 129 Cal.App.4th 1107, 1114.) In any event, they are without merit. A brief discussion will suffice.

Christiansen argues that Strategic's invoices were fully audited; that Strategic's compensation was not excessive; that the District is pursuing additional bonds without influence from Strategic; and that Strategic had fully delivered on what had been asked of it. We ask the rhetorical question, "What does this have to do with section 1090?" The answer: nothing.

In *Thomson v. Call* (1985) 38 Cal.3d 633, 648, our Supreme Court stated that a violation of section 1090 does not require actual dishonesty or fraud or an actual loss to the public agency. Whether a contract is fair, just and equitable to the public agency, or whether it is more advantageous to the public entity than another contract has no bearing on the question of its validity under section 1090. (*Id.* at p. 649.)

Christiansen argues that Strategic was not the force behind the new bonds. She cites evidence that the Board expressed concern for seismic safety and its desire to promptly discharge that obligation. But Christiansen cites no evidence that the Board was contemplating placing the bond measure on the ballot until she became involved. In any event, whether Strategic was the force behind the bonds is beside the point. What is relevant is that Christiansen was the force behind the $16 million contract awarded to Strategic.

Christiansen argues Superintendent Gross had a conflict of interest in that he was working for a direct competitor of Strategic. Assuming it is true, Christiansen fails to say how it is relevant to this appeal. At most, the argument goes to the weight of Gross's testimony, a matter of no concern on appeal.

Finally, Christiansen argues the District's counsel intimidated McVeigh and the District's director of human resources, Nora Rogue, in an effort to convince them not to testify at trial. Both McVeigh and Rogue testified someone who identified himself as the District's counsel called and advised them to assert their Fifth Amendment right not to testify. Both testified without invoking the Fifth Amendment. Christiansen fails to state the relevance of this allegation to this appeal.

## II

The District contends the trial court erred in refusing to instruct the jury on the failure to comply with competitive bidding statues. (§ 4525 et seq.)

Section 4529.12 provides in part: "All architectural and engineering services shall be procured pursuant to a fair, competitive selection process . . . ." Section 4529.10 defines "architectural and engineering services" to include "construction project management services." Contracts that fail to comply with the competitive bidding statutes are unenforceable. (See *Santa Monica Unified Sch. Dist. v. Persh* (1970) 5 Cal.App.3d 945, 952.)

The District pled section 4525 et seq. both as an affirmative defense to Christiansen's action on the contract and in the District's cross-complaint to recover money paid to Christiansen under the contract. The District proposed special jury instructions on the issue prior to trial.

15

Thereafter, the District dismissed its cause of action pursuant to section 4525 et seq. from its cross-complaint. The dismissal does not mention section 4525 et seq. as an affirmative defense.

Christiansen moved in limine to exclude any evidence or argument that her contract was unenforceable under section 4525 et seq. The trial court denied the motion.

The trial court, however, did not instruct the jury on the failure to comply with the competitive bidding statutes. Nor is such an instruction included in the record under refused or withdrawn instructions. The District points to no ruling by the court or offers any other explanation for why the instruction was omitted. Perhaps it was omitted inadvertently.

Christiansen argues that the District waived the issue when it dismissed its claim before trial. But the dismissal was only on the cross-complaint. It did not affect the District's affirmative defense.

Christiansen argues that the District waived the matter when, after it initially proposed the instruction, it did not "further pursue" an instruction on the issue. Christiansen claims the District acquiesced in the removal of the instruction during the trial court's jury instruction conference.

Because we are reversing, we need not decide this question. In the event of a retrial, the District may request, if it so desires, an appropriate instruction.

### III

For the benefit of the trial court and parties in the event of a retrial on remand, we consider the question of damages.

The 2008 contract between the District and Christiansen contains what the parties refer to as a 'termination for

convenience" clause. The clause allows the District to terminate Strategic's contract without cause upon 120 days' written notice. Upon termination, the District is required to pay Strategic for services performed and expenses incurred to the date of termination. In addition, the District must pay a "Termination Fee" of the equivalent of one month's payment based on the average of valid invoices for the previous three months.

The clause concluded: "In the event a termination for cause is determined to have been made wrongfully or without cause, then the termination shall be treated as a termination for convenience . . . and CONSULTANT shall have no greater rights than it would have had if a termination for convenience had been effected in the first instance. No other loss, cost, damage, expense or liability may be claimed, requested or recovered by CONSULTANT."

The parties have differing interpretations concerning the application of this clause. There is evidence from which a reasonable trier of fact could find Christensen received notice of termination from the District. Christiansen claims, however, the District did not give Strategic notice of termination. On August 13, 2009, the District's attorney wrote to Christiansen's attorney advising that Strategic's contracts with the District are void. If the letter is not enough, the District physically removed Christiansen from the District's premises on the same day. Even if the District's termination was wrongful, the contract expressly provides the wrongful termination shall be treated as a termination for convenience.

Christiansen argues the District breached the termination for convenience clause by failing to give notice 120 days prior to termination. She concludes that the clause is unenforceable and

she is entitled to damages for the entire remaining term of the contract.

But where a party has the right to terminate a contract without cause upon a specified period of notice, damages for breach is limited to lost profits for the period of the notice. Thus, in *Martin v. U-Haul Co. of Fresno* (1988) 204 Cal.App.3d 396, the contract allowed the defendant to terminate without cause on 30 days' written notice. The defendant terminated the contract without notice. The jury awarded plaintiff $29,000 for breach of contract. The trial court granted the defendant's motion for a new trial on the ground of excessive damages subject to the condition that the motion would be denied if plaintiff agreed to a reduction in damages to $725. Plaintiff appealed and the Court of Appeal affirmed. Where the defendant had the right to terminate the contract without cause on 30 days' notice, plaintiff's damages for breach are limited to 30 days. (*Id.* at pp. 407-408.)

Christiansen's reliance on *Kuffel v. Seaside Oil Co.* (1970) 11 Cal.App.3d 354 is misplaced. There defendant contracted to sell gasoline to plaintiffs for a 10-year period. Simultaneously plaintiffs leased a gasoline station from defendant for the same 10-year period. The sales contract gave defendant the right to terminate the contract on 15 days' written notice. The lease contained no such provision. Defendant induced plaintiffs to agree to terminate the sales contract by fraudulently representing a new contract would be executed. The jury found defendant breached the sales contract and awarded substantial damages. The Court of Appeal rejected defendant's argument that damages should be limited to 15 days. Among the reasons the court gave was that the sales contract was not terminable on

15 days' notice.  The court viewed the sales contract and 10-year lease as parts of the same transaction.  The court concluded that the right to terminate the sales contract was intended to take effect only after the lease ceased to exist.  (*Id.* at p. 368.)

Here there is no similar impediment to the exercise of the District's right to terminate the contract without cause.  The correct measure of damages arising from the District's failure to give 120 days' notice is limited to 120 days' lost profits.

Thus, assuming the trier of fact finds that the District breached Strategic's contract, damages would be limited to: compensation for services performed and expenses incurred to the date of termination; lost profits Strategic can prove it suffered for 120 days after termination; and the equivalent of three months' payment based on the average of the previous three months.

The judgment is reversed for further proceedings consistent with this opinion.  Costs are awarded to appellant.

<u>CERTIFIED FOR PUBLICATION.</u>

GILBERT, P. J.

We concur:

YEGAN, J.

19

TANGEMAN, J.:

I concur with the majority that the trial court erred by refusing to instruct the jury on Government Code section 1090 and that this case must be remanded for retrial with an appropriate instruction.  I do not join in the majority's recitation of facts to the extent it involves resolution of disputed evidence.  (*South Coast Framing, Inc. v. Workers' Comp. Appeals Bd.* (2015) 61 Cal.4th 291, 304 ["The Court of Appeal is not free to reweigh the evidence"].)  Finally, I do not join in part III (damages on retrial) as it is both unnecessary and involves the resolution of disputed evidence.  (*People v. Contreras* (2018) 4 Cal.5th 349, 381 [stating a "'cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more'"].)


TANGEMAN, J.

J. Stephen Czuleger, Judge

Superior Court County of Los Angeles

_____


Horvitz & Levy LLP, Barry R. Levy, Bradley S. Pauley, Scott P. Dixler; Greenberg Glusker Fields Claman & Machtinger LLP, Fred A. Fenster, Steven A. Stein for Defendant, Cross-complainant and Appellant.

Law Offices of Philip Kaufler, Philip Kaufler; Law Offices of Jonathan P. Chodos, Jonathan P. Chodos for Plaintiff, Cross-defendant and Respondent.