[S. F. No. 16828.   In Bank.   Mar. 19, 1943.]

BETHLEHEM STEEL COMPANY (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION, LOVINE GEORGE et al., Respondents.

R. P. Wisecarver for Petitioner.

Everett A. Corten and Dan Murphy, Jr., for Respondents.

GRIFFIN, J. pro tem.—This is a proceeding to review an award of compensation by the Industrial Accident Commission in favor of certain employees working in shipyards of petitioner who had contracted the contagious eye disease known as kerato conjunctivitis. Separate awards were made to ten employees of petitioner who had contracted kerato conjunctivitis. The cases were consolidated for this proceeding. The commission made the following finding as to the employees: that each "while employed . . . during the month of December, 1941, at San Francisco, California, by Bethlehem Steel Company, Shipbuilding Division, sustained injury arising out of and in the course of his employment as follows: while working in the shipyards of defendant . . . contracted a contagious disease known as kerato conjunctivitis, which was then epidemic in the shipyards of said defendant. . . ."

Petitioner contends that the claimants failed to prove that the disease they acquired was acquired by reason of their employment in the shipyards and that the findings and evidence are insufficient to support the awards. It is not disputed that the extent of the disease among shipyard workers amounted to an epidemic. Petitioner contends, however, that the proof was conclusive that the disease was also epidemic in San Francisco and other places and that there has been a complete failure to prove that the disease was contracted by claimants during and because of their employment. The commission asserts that although there were many cases of the disease among the public, there is nothing in the record to show that the same proportion as in the shipyards was affected; that if the disease was of epidemic proportions among the general public the burden of proof as to this fact lies with the employer, because it is an affirmative defense and the burden is upon the one asserting the affirmative of the issue, citing Labor Code section 5705. There is no merit to this last contention. That section provides that the burden of proof rests upon the party holding the affirmative of the issue. The section then lists certain affirmative defenses in which the burden of proof rests upon the employer. The contentions of the commission cannot be brought within any of those specific affirmative defenses.

In *Pattiani* v. *Industrial Acc. Com.*, 199 Cal. 596, 600-601 [250 P. 864, 49 A.L.R. 446], it was held, as it must be held

here, that where an *employee* contracts a contagious or infectious disorder he *must,* in order to recover compensation, *establish the fact* that he was subjected to some *special exposure* in excess of that of the commonalty, and in the absence of such showing, the illness cannot be said to have been proximately caused from an injury arising out of his employment. To the same effect are *Pacific Employers Insurance Co.* v. *Industrial Acc. Com.,* 19 Cal.2d 622, 628 [122 P.2d 570, 141 A.L.R. 798], and *Children's Hospital Society* v. *Industrial Acc. Com.,* 22 Cal.App.2d 365 [71 P.2d 83].

■ It is well established in this state that compensation is not due merely for injury caused by disease contracted by an employee while employed. The injury must be one arising out of the employment, and where the injury is by disease, there must exist the relation of cause and effect between the employment and the disease. It is also true that to justify an award there must be an affirmative showing of a case within the statute and it must affirmatively appear that there exists a reasonable probability that the employee contracted the disease because of his employment. (*San Francisco* v. *Industrial Acc. Com.,* 183 Cal. 273, 282 [191 P. 26].) It must further be shown that the disease contracted was not merely a hazard of the community but that the employee was subjected to some special exposure in excess of that of the commonalty. In the absence of such showing, the illness of the employee cannot be said to have been proximately caused by an injury arising out of his employment or by reason of a risk or condition incident to the employment. (*Pattiani* v. *Industrial Acc. Com., supra; Pacific Employers Ins. Co.* v. *Industrial Acc. Com., supra.*) The employee's risk of contracting the disease by virtue of the employment must be materially greater than that of the general public, i.e., the injury must be a natural or a reasonably probable result of the employment or of the conditions thereof. (*Storm* v. *Industrial Acc. Com.,* 191 Cal. 4 [214 P. 874] ; *Hartford Acc. & Ind. Co.* v. *Industrial Acc. Com.,* 140 Cal.App. 482 [35 P.2d 366] ; Campbell's Workmen's Compensation, vol. 1, p. 248, sec. 247.) ■ Whether the employee respondents have produced evidence sufficient to bring themselves within this rule is the remaining question. A review of the evidence is essential to a proper determination thereof.

The testimony of the medical experts describes the disease of kerato conjunctivitis to be an infection caused by a

virus starting in the lids of the eye with a deep infiltration of the tissues of the conjunctiva. The lids become swollen and the irritation spreads from the lids onto the sclera of the eye. From medical experience it has been found that complete rest in bed, with protection from light and by compressing with epsom salts solution, produces better results than any other type of treatment; that if the recovery is rapid, no particular damage is done and a man might return to his work in from three days to two weeks; that in a substantial portion of the cases there is a deeper involvement, with implication of the bones of the face and the glands in front of the ear and under the jaws; that at a later period the disease then appears on the cornea and that in this particular it differs markedly from the old and more common disease known as "pink eye"; that it is this later manifestation in the cornea that causes concern; that if the condition does appear in the cornea there is a peculiar formation of minute blebs in the center of the pupil and it takes several months before absorption is complete. The testimony in reference to the appearance of this disease in the plant of petitioner shows that the employees here involved received some prior eye injury, affliction or irritation in the plant and were treated in the company's first-aid station by first-aid employees or nurses of the company in a manner usually followed in the treatment of the ordinary eye injuries complained of and without knowing at the time that the patient was then infected with or might thereafter become infected with the eye disease known as kerato conjunctivitis. It appears in the cases here involved that several days after the first-aid treatments the employee "broke out with kerato conjunctivitis." The standard routine with the employer's first-aid station in any case of complaint concerning the eyes was to examine them for a foreign body. This was true even where the complaint was of a "flash" burn. The examination was conducted with the hands and with metal or wooden instruments or eye droppers. The commission concedes that the first-aid attendants employed by petitioner, although they were not doctors or registered nurses, exercised reasonable care in treating the eyes of the employees who came in with various eye complaints. Until about December 20, however, the record discloses, these people were not aware that they were dealing with an epidemic and treated each case as an

individual disorder arising from one of the ordinary types of eye injury. When the epidemic became manifest, the attendants were instructed to use extraordinary care. They were told to use a different medicine dropper for each patient, which they had not been doing before. The evidence shows that they did use the same eye dropper for man after man without sterilization.

Lovine George, one of the claimants, testified that he suffered what is called a welder's "flash" which necessitated his eyes being treated at the employer's first-aid station; that about two weeks after his eyes were washed for this "flash" he broke out with kerato conjunctivitis. The same general history as to a previous injury or irritation, treatment and results, prevailed as to the other claimants. One of the medical experts testified that the general incubation of the disease is about five days but that many patients go on working for some days without very many symptoms "and as a rule, fail to report to the doctor until the eye is pretty well involved." Applicant Pierce testified that before the epidemic he was in a line with four or five employees and that the attendant treated each of them without washing his hands. Applicant Levin testified that: "I did see the attendant standing right in front of the chair and never moved to go to the back (to wash his hands). He wouldn't turn away at all. He would take his fingers and lift the lid of the eye without stepping away from the time he gets rid of the last patient. As soon as one steps off there was another man ready to step in the chair"; that the attendants opened the patients' eyelids with their fingers. One of the employer's doctors (Crawford) testified that the attendants had been instructed to "wash their hands carefully if there is any chance of the case being an infectious one."

The commission throughout excuses the method of treatment by the attendants because "it must be remembered that when most of these employees were first being treated for eye injuries there was no knowledge on the part of the attendants that an infection was present." Dr. Crawford also testified that when the epidemic became apparent he "then advised them to change their technique by not touching the eye at all with the bare fingers but using cotton from the end of the fingers to open the lid." Before it was known that infection was spreading, employees were sometimes allowed to treat themselves at the first-aid clinic when it was crowded and

everyone was busy. While the evidence is conflicting, Dr. Carr testified that abrasions from foreign substances in the eye would cause irritation which increased the susceptibility of the membrane to infection by the disease. A Dr. Hogan, from the University of California clinic, one of the chief witnesses for the employer, testified in response to a question by the referee:

"Q. Doctor, this disease (kerato conjunctivitis) has not been nearly as prevalent in the general population on a percentage basis as it has at the shipyards, has it? A. *I think the disease started in the shipyards* (italics ours) and I think we are beginning to see it in the population now." He then testified that there was some talk about the disease originating in Java or Burma and that he thought it "was brought over here from some place like that. I think that is the source of the disease. . . . The disease is endemic in those areas. It is there all the time and any boat coming in could bring a carrier, a person who would transmit the disease. . . . Maybe a fellow went there where the Navy builds bases, or maybe the Navy evacuated civilians from China or from the Philippines. It is probably there, too. They could have brought it from there, women and children. Then I think it is in all the shipyards, because we will say a fellow works in Todds. He quits or might get fired at Todds and come over to the Bethlehem and get a job or a fellow working in Los Angeles would come up here. I understand they have got a pretty severe epidemic down there now. Q. In the shipyards? A. Generalized, but one place I heard particularly, one of the doctors told me their first-aid man was up from down there, and they have quite a few cases. I don't known which one. Q. On a percentage basis, if they had had 280 cases from the Bethlehem, which was testified to this morning, with 13,000 men out there, that would be about 2 per cent which would allow for 14,000 cases in a city the size of San Francisco of 700,000; there hasn't been anything like that in the city, has there? A. I don't know. I doubt it very much. Of course, people . . . I don't think there have been that many or we would have seen more in the clinic as clinic patients, probably more than we have. I have probably seen 12, I suppose."

The testimony of Dr. Crawford indicates the possibility that the disease did spread in the shipyards because of the working conditions. In response to a question he replied:

"Q. And the close proximity of one worker with another with some 13,000 persons thrown into one position more or less makes a spreading of the disease—rather adds in the spread of any disease? A. Oh, yes, it does, because where a lot of men are crowded together that means use tools in common, they probably worked at the same benches and they wiped their eyes and put their Kleenex or handkerchief on the bench, or they shake hands with each other more frequently, and I believe it is in ways like that that the disease is transmitted. I think the disease is transmitted from the discharge that comes from the eye."

Petitioner contends that there was a similar epidemic of the disease in San Francisco at the time and therefore these claimants have not established that they were subject to special exposure in excess of that of the commonalty. There was quite substantial evidence produced by the employer company that would indicate that the particular disease did not necessarily originate in the shipyards of the petitioner and also that it was epidemic in character and prevailed to some extent in the community as well as in the shipyards. The record shows that after it was discovered that many of the employees had contracted the disease they were refused permission to work at the plant and they were no longer given treatment at the first-aid station. Instead, they were referred to Dr. Crawford and Dr. Hogan, research eye specialists connected with the University of California, who were endeavoring to discover a specific cure for the disease. Dr. Crawford testified that the disease was one that had recurring epidemics over the world since 1889; that there were epidemics in Europe in 1889, in India in 1900, and an extensive epidemic in Germany in 1939, and in the same year an epidemic in San Fernando Valley, California; that the disease was first noted in San Francisco in occasional cases throughout the year, but "not very many of these cases"; that just before Christmas it "had been seen in large numbers in farming communities, Sacramento, Stockton" (10 or 20 cases); that the term "epidemic" is a relative term and that he did not know how many cases constituted an epidemic; that epidemics tend to be localized at first and then spread out to other parts of the country; that in his opinion the kerato conjunctivitis does not and did not in any of the cases he examined have any "relation to any preceding injury" of the eye; that the disease was a new one to him in its epidemic

form until around December, 1941; that he had seen ten or twenty cases before he "realized we were dealing with an epidemic"; that of the 200 people he had examined for the disease only ten were from outside the Bethlehem Steel Company plant. Another doctor, an eye specialist and resident of San Francisco, testified that he had examined 35 or 40 similar cases; that the first case he had began in August, 1941, and was one of the first cases on record in San Francisco; that of the last 25 cases he examined he could find not even a remote connection with employment at the shipyards; that 75 per cent of those examined were women. Another doctor from the Stanford Medical School, practicing in San Francisco, testified that about six or seven months prior to February 5, 1942, two or three patients, not industrial cases, came to his office for examination with the eye disease and that "since the disease has become epidemic we have realized that those isolated cases belong to the same group." Dr. Hogan testified that of the 142 proved cases sent to him, 91 were from industrial plants, from other places 51; that about 80 of the 91 came from shipyards; that in September he treated one isolated case, a secretary in a downtown office; that in October, 1941, he was called to Santa Rosa, California, and found 18 patients with this eye disease; that a doctor wrote him that he had seen about 100 cases in Stockton; that another in New York said he had seen 8 cases in his practice; and that in Portland he heard that there were about 100 cases. This is about the extent of the testimony received in reference to the question whether the disease was also epidemic in San Francisco and other places and whether or not the exposure was such a special exposure as to be in excess of that of the commonalty.

It must be conceded, as related by the doctor, that the term "epidemic" is a relative term and that the question of how many cases constitute an epidemic is a question of fact depending upon the prevailing circumstances. This term, in its common and ordinary meaning, applies to any disease which is widely spread or generally prevailing at a given place and time. (*Pohlaski* v. *Mutual L. Ins. Co.*, 36 N.Y, Super. Ct. 234; Black's Law Dictionary, 3d ed. p. 669; *Martin* v. *Springfield City Water Co.*, (Mo.App.) 128 S.W.2d 674.) It is conceded that the number of reported cases compared to the number of employees in the shipyards here involved constituted an

epidemic. The evidence is quite convincing that the disease in the community outside of the shipyards was of much less proportion compared to the population. Whether the proportion established by the evidence constituted an epidemic was a question of fact to be determined by the commission. From its implied finding it is apparent that it has found that the epidemic in the shipyards constituted a special exposure in excess of that of the commonalty. Under the evidence we cannot disturb this finding. (*San Francisco* v. *Industrial Acc. Com., supra.*)

The only remaining question is whether or not the injury and sickness complained of can be said to have been proximately caused by and to have arisen out of the employment by reason of such exposure. Disregarding conflicting and hearsay evidence, there is testimony, circumstantial as well as direct, if believed by the commission, that "the disease started in the shipyards." (See quoted testimony of Dr. Hogan.)

We have carefully examined the testimony of each of the claimants with reference to the history of previous eye injuries. All have testified that they received treatment at the company's first-aid station for several specified eye injuries and irritations such as welder's "flash," "specks of steel, metal, foreign particles or foreign bodies in the eye" or burns from "fumes," and that within a few days after treatment for the eye injuries above mentioned in the first-aid station the eye disease known as kerato conjunctivitis developed. This evidence, when considered with the testimony in reference to the manner of treatment of the eye injuries before discovering that the disease was an epidemic in the plant and the testimony of Dr. Carr, assistant professor of the University of California and graduate of Harvard Medical School specializing in pathology, that in his opinion "abrasion and irritation" of the eye "increases the susceptibility of the membrane to infection" and the testimony of Dr. Hogan that "a flash would make the eye more or less resistant to any infection," brings us to the conclusion, notwithstanding the medical testimony to the contrary, that the question whether the eye disease, classified as an injury was one arising out of and in the course of employment, was one of fact for the determination of the commission. The time-honored rule, therefore, must apply, that in the case of a conflict of evidence this court may not disturb the finding of the

commission where there is substantial evidence to support it. (*Chichester* v. *Seymour,* 28 Cal.App.2d 696 [83 P.2d 301]; *San Francisco* v. *Industrial Acc. Com.,* 183 Cal. 273 [191 P. 26]; *Pacific Employers Insurance Co.* v. *Industrial Acc. Com.,* 19 Cal.2d 622 [122 P.2d 570, 141 A.L.R. 798].)

Awards affirmed.

Gibson, C. J., Shenk, J., Curtis, J., Edmonds, J., Carter, J., and Traynor, J., concurred.

Petitioner's application for a rehearing was denied April 15, 1943.