Filed 5/28/15

# IN THE SUPREME COURT OF CALIFORNIA

SOUTH COAST FRAMING, INC. et al., )
)
          Petitioners, )
)              S215637
            v. )
)       Ct.App. 4/1 D063945
WORKERS' COMPENSATION )
APPEALS BOARD, JOVELYN CLARK )
et al., )
)    (WCAB No. ADJ7324566)
)
          Respondents. )
_____)

The family of Brandon Clark was awarded workers' compensation death benefits after Clark died from the combination of drugs prescribed following a fall at work. The Court of Appeal overturned the award, reasoning there was insufficient evidence that the drugs prescribed for the work injury contributed to the death. We reverse the Court of Appeal's judgment.

## I. BACKGROUND

In September 2008, the 36-year-old Clark fell eight to 10 feet while working as a carpenter for South Coast Framing, Inc. (hereafter "the employer"). He suffered neck and back injuries as well as a concussion. Clark's workers' compensation doctor prescribed various drugs to treat these injuries, including Elavil (an antidepressant), Neurontin (a neuronal pain reliever), and Vicodin (a codeine-based pain reliever). In January 2009, Clark's personal doctor

additionally prescribed Xanax (an anti-anxiety medicine) and Ambien (a sleep aid).

On the morning of July 20, 2009, Clark's wife was unable to rouse him and he was pronounced dead at the scene. At the time of his death, Clark had Elavil, Neurontin, Xanax, and Ambien in his blood. Vicodin was detected in his urine.[1] The autopsy surgeon concluded the death was accidental and "is best attributed to the combined toxic effects of the four sedating drugs detected in his blood with associated early pneumonia." The first two medications were prescribed by the workers' compensation physician. There was no dispute that Clark died as a result of the combined effects of some of the drugs he took. The dispute centered around which drugs played a role, how big that role was, and why the drugs were prescribed.

Clark's wife, Jovelyn, and their three minor children (hereafter "the family") sought death benefits, arguing medications prescribed for Clark's industrial injury caused his death. Jovelyn stated at her deposition that Clark's personal doctor had prescribed Ambien because Clark was having trouble sleeping. Before the accident, Clark had sometimes taken Tylenol PM to help him sleep. Clark's physician prescribed Xanax for an anxiety attack suffered just before an unrelated surgical procedure. Clark also received epidural shots from his workers' compensation doctor to alleviate continuing neck and back pain. Shortly after the second epidural injection, Clark complained to his wife and brother that he would experience "blackout" episodes. Clark continued to suffer

---

[1] Both the medical experts and the workers' compensation judge used brand names and chemical names of drugs interchangeably. For consistency, we use the brand names. The chemical names are shown in parentheses: Elavil (amitriptyline), Neurontin (gabapentin), Vicodin (hydrocodone), Xanax (alprazolam), and Ambien (zolpidem).

from pain, which had gotten progressively worse and was not relieved by the injections.

Dr. Daniel J. Bressler concluded Clark died of an accidental drug overdose. His supplemental report stated that "[t]he specific combination of medicines he was on, which included Xanax, Ambien, Flexeril, Neurontin, [Elavil], and [Vicodin], all separately and in combination had the capacity to induce respiratory depression, and even respiratory arrest." Bressler also found that Clark's reports to his wife and brother of "altered states of consciousness" were "probably . . . warning episodes of untoward synergistic respiratory depression and/or central nervous system depression prior to the date of death."

The parties agreed upon Dr. Thomas C. Bruff as a qualified medical examiner. Bruff reported that Neurontin "did not have a role in this particular case" and Elavil "was prescribed in such low dose, and blood levels show that the medication was likely taken as prescribed." Bruff concluded: "However, [Ambien] and [Xanax] [prescribed by Clark's personal physician] [were] found in excess of what would be normally considered peripheral blood concentrations. Both these medications work in a similar fashion and would be considered at least additive in their effects. It is my opinion . . . that it is just this additive effect of [Ambien] and [Xanax] that caused sedation significant enough to result in the events leading to [Clark's] death." Thus, Bruff's report concluded that Clark's overdose was caused solely by medications prescribed by his personal doctor and not his workers' compensation physician.

Dr. Bruff's subsequent deposition testimony retreated somewhat from his report. Bruff maintained that Neurontin played no role in Clark's death. However, he testified that Elavil "may have had a small role at the levels found." Although he believed Ambien and Xanax had "more weight," he could not "absolutely slam the door and say [Elavil] had no effect." Clark's Elavil level was

3

elevated for his prescription level but insufficient to be fatal as the sole or predominant cause of death. When asked if Elavil, in combination with Ambien and Xanax, could have "contributed" to Clark's death, Bruff answered, "it's possible" and that Elavil "could be an incremental contributor," although "the [Xanax] and [Ambien] being in the same class and at a much higher dose . . . kind of carried the day." Bruff reiterated that Elavil was "way down there" as a cause of death and it would be "really speculative" to place a percentage on it. When asked if Elavil "might have been what just put it over the edge" to cause Clark's death, Bruff agreed it was possible but "[t]he exact amount is way down there" and "we literally are dancing about the minimum level of causation . . . ." Bruff acknowledged Elavil was "additive" and part of the causation "pie," but he could not assign a number reflecting the percentage of causation attributable to it, suggesting "it would be closing your eyes and throwing a dart at a dartboard kind of stuff" or "just pulling numbers out of the sky." When asked again to assign a number, Bruff responded "[w]e're looking at one percent causation and we're dangling right down there," but it would be "medically improper to sit here and say that I can pull a percentage out." He acknowledged, "It's not zero, but it's certainly not twenty percent either, where it's a no brainer." Bruff noted Vicodin was detected in Clark's urine, but not blood. Asked if Vicodin could have contributed to the death, Bruff stated "it's potentially a cause, but it's so miniscule, it's like you have a big twelve inch pie and a couple little crumbs off the crust are due to the Vicodin. You wouldn't even notice it if you served up the pie, having two little flakes gone."

There was conflicting evidence as to why Clark's physician prescribed Ambien. His wife testified he had taken Tylenol PM before the accident to help him sleep, but after the fall the Tylenol PM was not working. The physician noted, however, that Clark was not in pain when he had trouble sleeping.

4

The workers' compensation judge (WCJ) awarded death benefits to the family, finding Clark's death resulted "due to the medications he was taking for his industrial admitted injury . . . ." The WCJ explained, "it is clear that the [Elavil] prescribed by the doctors for the industrial injury as well as the [Vicodin] acted as concurring causes such that, even without the liberal construction of Labor Code §3202, the death of BRANDON CLARK was a result of the original industrial injury . . . ." The WCJ further found "that the applicant was suffering from continued or chronic pain from his industrial neck, back and head injury and that he was having difficulty sleeping because of that pain," and that "the doctors prescribed him both the Ambien . . . and the [Xanax] for the inability to sleep."

The employer petitioned the Workers' Compensation Appeals Board (Board) for reconsideration, arguing no substantial evidence supported the WCJ's causation finding. The WCJ issued a report recommending the petition be denied. The Board adopted the WCJ's report and denied reconsideration. The Court of Appeal granted the employer's petition for writ of review and reversed. We granted the family's petition for review.

## II. DISCUSSION

Labor Code[2] section 3600, subdivision (a) provides that workers' compensation liability "shall, without regard to negligence, exist against an employer for any injury sustained by his or her employees arising out of and in the course of the employment and for the death of any employee if the injury proximately causes death." " 'The requirement of Labor Code section 3600 is twofold. On the one hand, the injury must occur "in the course of the employment." This concept "ordinarily refers to the time, place, and

---

[2]     Subsequent statutory references will be to the Labor Code unless noted.

5

circumstances under which the injury occurs." [Citation.] . . . [¶] On the other hand, the statute requires that an injury "arise out of" the employment . . . . It has long been settled that for an injury to "arise out of the employment" it must "occur by reason of a condition or incident of [the] employment. . . ." [Citation.] That is, the employment and the injury must be linked in some causal fashion.' " (*LaTourette v. Workers' Comp. Appeals Bd.* (1998) 17 Cal.4th 644, 651, fn. omitted (*LaTourette*), quoting *Maher v. Workers' Comp. Appeals Bd.* (1983) 33 Cal.3d 729, 733-734 (*Maher*).) "The applicant for workers' compensation benefits has the burden of establishing the 'reasonable probability of industrial causation.' " (*LaTourette*, at p. 650, quoting *McAllister v. Workmen's Comp. App. Bd.* (1968) 69 Cal.2d 408, 413 (*McAllister*).) If the injury causes death, the worker's dependents are entitled to a death benefit. (§ 4701, subd. (b).) As discussed *post*, workers' compensation liability may also encompass a subsequent nonindustrial injury or death attributable to the initial industrial accident.

The question here is the required nature and strength of the causal link between the industrial injury and death. Tort law and the workers' compensation system are significantly different. One result of the difference is the role and application of causation principles. "[A]lthough Labor Code section 3600 refers to 'proximate cause,' its definition in workers' compensation cases is not identical to that found in the common law of torts. [Citation.] 'In fact, the proximate cause requirement of Labor Code section 3600 has been interpreted as merely elaborating on the general requirement that the injury arise out of the employment.' [Citation.] The danger from which the employee's injury results must be one to which he was exposed in his employment. [Citation.] ' "All that is required is that the employment be one of the contributing causes without which the injury would not have occurred." ' [Citation.]" (*LaTourette, supra,* 17 Cal.4th at p. 651, fn. 1, quoting *Maher, supra,* 33 Cal.3d at p. 734, fn. 3.)

6

Legal causation in tort law has traditionally required two elements: cause in fact and proximate cause. "An act is a cause in fact if it is a necessary antecedent of an event." (*PPG Industries, Inc. v. Transamerica Ins. Co.* (1999) 20 Cal.4th 310, 315.) This has traditionally been expressed as the " 'but for' " test, i.e., if the injury "would have happened anyway, whether the defendant was negligent or not, then his or her negligence was not a cause in fact." (6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 1185, p. 552; see *Viner v. Sweet* (2003) 30 Cal.4th 1232, 1239-1240.) "California has definitively adopted the substantial factor test of the Restatement Second of Torts for cause-in-fact determinations. [Citation.] Under that standard, a cause in fact is something that is a substantial factor in bringing about the injury." (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 968-969.) "[T]he 'substantial factor' test subsumes the 'but for' test." (*Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1052; see *Viner,* at p. 1240.) " 'The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical.' [Citation.] Thus, 'a force which plays only an "infinitesimal" or "theoretical" part in bringing about injury, damage, or loss is not a substantial factor' [citation], but a very minor force that does cause harm is a substantial factor [citation]. This rule honors the principle of comparative fault." (*Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71, 79; 6 Witkin, Summary of Cal. Law, *supra*, Torts, § 1193, p. 568.)

On the other hand, the workers' compensation system is not based upon fault. "It seeks (1) to ensure that the cost of industrial injuries will be part of the cost of goods rather than a burden on society, (2) to guarantee prompt, limited compensation for an employee's work injuries, regardless of fault, as an inevitable cost of production, (3) to spur increased industrial safety, and (4) in return, to insulate the employer from tort liability for his employees' injuries." (*S. G.*

7

*Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 354; see Cal. Const., art. XIV, § 4; *Chevron U.S.A., Inc. v. Workers' Comp. Appeals Bd.* (1999) 19 Cal.4th 1182, 1189.) Accordingly, "[t]he statutory proximate cause language [of section 3600] has been held to be less restrictive than that used in tort law, because of the statutory policy set forth in the Labor Code favoring awards of employee benefits. In general, for the purposes of the causation requirement in workers' compensation, it is sufficient if the connection between work and the injury be a contributing cause of the injury . . . ." (*Nash v. Workers' Comp. Appeals Bd.* (1994) 24 Cal.App.4th 1793, 1809; see *LaTourette, supra,* 17 Cal.4th at p. 651, fn. 1; *Maher, supra,* 33 Cal.3d at p. 734, fn. 3; see also § 3202.)

The Court of Appeal reversed the WCJ's factual finding of proximate cause here, concluding no substantial evidence supported the finding. The court reasoned that Dr. Bruff's deposition testimony, even if considered a change of opinion from his earlier report, "was largely based on surmise, speculation, conjecture and guess," noting that he could not place a percentage figure approximating the level of causation attributable to the industrially prescribed medications. The Court of Appeal reasoned: "Here, Dr. Bruff admitted that it is difficult to make a 'reasonable medical analysis' regarding [Elavil's] precise contribution to Brandon's death. He also stated that making that kind of determination 'really gets to be speculative.' Liberally construing Dr. Bruff's testimony and report in its totality, we conclude the evidence did not establish industrial causation. Rather, the evidence demonstrates that if [Elavil] played a role at all, it was not *significant* such that it constituted a *material factor* contributing to Brandon's death." (Italics added.)

The Court of Appeal thus concluded that, although Elavil "played a role" in Clark's death, it was insufficient to prove proximate causation because it was not

8

sufficiently "significant" or a "material factor." This analysis fails to honor the difference between tort law principles and the application of the workers' compensation scheme. Tort liability only attaches if the defendant's negligence was a significant or substantial factor in causing injury. In the workers' compensation system, the industrial injury need only be a contributing cause to the disability.

In states that permit it, tort law mitigates liability by recognizing comparative fault. A defendant's liability may be reduced by the degree to which a plaintiff's own negligence contributed to the injury. Under workers' compensation, generally, liability is mitigated by apportioning monetary compensation to the degree that an industrial injury contributed to the disability. However, as we discuss later, apportionment is not applied in death claims.

We have recognized the contributing cause standard since the very beginning of the workers' compensation scheme. In *Kimbol v. Industrial Acc. Commission* (1916) 173 Cal. 351, we adopted the definition of " 'arising out of employment' " given by the Supreme Judicial Court of Massachusetts: " '[The injury] arises out of the employment when there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury. Under this test, if the injury can be seen to have followed as a natural incident of the work and to have been contemplated by a reasonable person familiar with the whole situation as a result of the exposure occasioned by the nature of the employment, then it arises "out of" the employment. But it excludes an injury which cannot fairly be traced to the employment as a *contributing* proximate cause and which comes from a hazard to which the workman would be equally exposed apart from the employment.' " (*Id*. at p. 353, italics added, quoting *In re McNicol* (Mass. 1913) 102 N.E. 697, 697.)

9

Contributing proximate cause within the meaning of *Kimbol* has been applied more broadly in the workers' compensation context than in tort law. Death attributable to both industrial and nonindustrial causes may support a death claim, and industrial causation has been shown in an array of scenarios where a work injury contributes to a subsequent nonindustrial injury. An employee is entitled to compensation if a new or aggravated injury results from medical or surgical treatment for an industrial injury. (*Fitzpatrick v. Fidelity & Casualty Co.* (1936) 7 Cal.2d 230, 233-234; *Georgia Casualty Co. v. Indus. Acc. Com.* (1927) 87 Cal.App. 333, 334-335 [death from anesthetic]; see *Maher, supra,* 33 Cal.3d at pp. 735-738 [adverse drug reaction when treatment was required for employment]; *Ballard v. Workmen's Comp. App. Bd.* (1971) 3 Cal.3d 832, 837-839 (*Ballard*) [drug addiction to prescribed pain medication].) Causation may also be shown if an industrial injury contributes to a later nonindustrial accident or injury. (See *Lundberg v. Workmen's Comp. App. Bd.* (1968) 69 Cal.2d 436, 439-441 [industrial back injury contributed to later ruptured disc]; *Ferreira v. Workmen's Comp. Appeals Bd.* (1974) 38 Cal.App.3d 120, 124-126 (*Ferreira*) [hernia suffered at work contributed to later hernia suffered at home]; *State Comp. Ins. Fund v. Ind. Acc. Com.* (1959) 176 Cal.App.2d 10, 13-21 (*State Comp. Ins. Fund*) [carpenter's industrial eye injury contributed to later nonindustrial accident while using a saw at home].) Indeed, even a worker's suicide may be compensable if an industrial injury contributed to it. (See *Chu v. Workers' Comp. Appeals Bd.* (1996) 49 Cal.App.4th 1176, 1181-1185; *Burnight v. Industrial Acc. Com.* (1960) 181 Cal.App.2d 816, 820-829.)

A corollary of the no-fault principles of workers' compensation is that "an employer takes the employee as he finds him at the time of the employment." (*Ballard, supra,* 3 Cal.3d at p. 837; *Maher, supra,* 33 Cal.3d at p. 734; *G. L. Eastman Co. v. Industrial Acc. Com.* (1921) 186 Cal. 587, 597 (*Eastman Co.*).)

10

Thus, "an employee may not be denied compensation merely because his physical condition was such that he sustained a disability which a person of stronger constitution or in better health would not have suffered." (*Duthie v. Workers' Comp. Appeals Bd.* (1978) 86 Cal.App.3d 721, 727; see *Maher*, at p. 734.)

Further, "the acceleration, aggravation or 'lighting up' of a preexisting disease is an injury in the occupation causing the same." (*Tanenbaum v. Industrial Acc. Com.* (1935) 4 Cal.2d 615, 617; see *Brodie v. Workers' Comp. Appeals Bd.* (2007) 40 Cal.4th 1313, 1326; *Ballard, supra,* 3 Cal.3d at p. 837; *Eastman Co., supra,* 186 Cal. at p. 594; see also *Industrial Indem. Exch. v. Ind. Acc. Com.* (1948) 87 Cal.App.2d 465, 467-470 [miner died from dust exposure at his last workplace, even though similarly exposed at previous worksites].) On this point, *McAllister, supra,* 69 Cal.2d 408 and *Ballard, supra,* 3 Cal.3d 832 are instructive. *McAllister* affirmed the award of a death benefit to the wife of a firefighter who died of lung cancer. Substantial evidence established the firefighter had inhaled toxic smoke throughout his 32 years of service, causing his cancer. *McAllister* rejected the argument that the claim should have been denied because the firefighter also "smoked about a pack of cigarettes a day for some 42 years." (*McAllister*, at p. 418.) *McAllister* noted that "the more smoke decedent inhaled—from whatever source—the greater the danger of his contracting lung cancer. His smoking increased that danger, just as did his employment. Given the present state of medical knowledge, we cannot say whether it was the employment or the cigarettes which 'actually' caused the disease; we can only recognize that both contributed substantially to the likelihood of his contracting lung cancer. As we noted, however, in *Employers etc. Ins. Co. v. Industrial Acc. Com.* (1953) 41 Cal.2d 676, 680, the decedent's employment need only be a 'contributing cause' of his injury. And in *Bethlehem Steel Co. v. Industrial Acc. Com.* [(1943)] 21 Cal.2d 742, 744, we pointed out a particular instance of this principle when we

11

stated that it was enough that 'the employee's risk of contracting the disease by virtue of the employment must be materially greater than that of the general public.' Thus in *Bethlehem* we allowed an award to an employee who contracted a contagious eye disease, since he had shown that the disease was more common at his place of employment than among the public. [¶] Although decedent's smoking may have been inadvisable, respondents offer no reason to believe that the likelihood of contracting lung cancer from the smoking was so great that the danger could not have been materially increased by exposure to the smoke produced by burning buildings." (*Id.* at pp. 418-419.)

In *Ballard*, a secretary suffered a back injury at work and was prescribed pain medication. Having a " 'low tolerance for pain of any kind,' " she took more than her prescribed dosages and became addicted. (*Ballard, supra,* 3 Cal.3d at p. 835.) Further, she sought out illegal drugs and became addicted to those as well. The referee denied her workers' compensation claim, concluding that " '[t]he most likely cause of her addiction is the obvious life-long neurotic personality problems and the injury simply serves to provide a rationalization for her recourse to drugs.' " (*Id.* at p. 837.) *Ballard* reversed, reasoning that the referee's findings did not "serve to warrant denial of recovery if the addiction resulted *in part* from the prescribed drugs. The employer takes the employee as he finds him at the time of employment. Similarly, the finding that her problems would have culminated in addiction 'even in the absence of this trauma and the treatment rendered thereafter' do[es] not furnish a basis for denial for all recovery because even in cases where disability would follow from the normal progress of the preexisting disease[,] apportionment is proper where the industrial injury has contributed to the disability. There is no finding that the prescribed drugs did not, along with the personality problems and the illegally obtained drugs, *contribute* to any part of the disability, and the findings do not support the denial of recovery." (*Id.* at p. 838,

12

italics added.) *Ballard* concluded: "The decisive question is not whether her actions in illegally obtaining drugs were a causative factor or contributed to her disability; the question is not whether it was appropriate for the doctors to prescribe drugs for her or whether they were to 'blame'; under the authorities discussed above, the question is whether the prescribed drugs were a causative factor in her present disability. Dr. Malitz nowhere states that her present condition was caused solely by her personality disorder and the unlawfully obtained drugs or that her present condition would have occurred absent the industrial injury and the prescribed drugs." (*Id*. at pp. 838-839; see *Lamb v. Workmen's Comp. Appeals Bd.* (1974) 11 Cal.3d 274, 279-283 [reversing the Board's reversal of death benefit where work stress caused hypertension leading to death from heart disease].) *Mark v. Industrial Acc. Com.* (1938) 29 Cal.App.2d 495 upheld a death benefit award where a worker died of heart occlusion. The opinion observed: "Assuming, if necessary, that decedent was afflicted with a weak and somewhat devitalized heart, that in itself is not determinative of the question here. If deceased was afflicted with such a condition and thereafter subjected himself to violent exertion and extraordinary strain in the course of his employment which *caused his death sooner than he otherwise might have suffered*, his dependents are entitled to compensation." (*Id*. at pp. 500-501, italics added.)

Whether an industrial injury proximately causes a later injury or death within the meaning of section 3600 is a question of fact. (See *Head Drilling Co. v. Industrial Acc. Com.* (1918) 177 Cal. 194, 197; *Smith v. Workers' Comp. Appeals Bd.* (1981) 123 Cal.App.3d 763, 773.) "Judicial review of the Board's decision on factual matters is limited to determining whether the decision, based on the entire record, is supported by substantial evidence." (*Guerra v. Workers' Comp. Appeals Bd.* (1985) 168 Cal.App.3d 195, 199; *State Comp. Ins. Fund,*

13

*supra,* 176 Cal.App.2d at pp. 13-14.)  In this context, judicial review has been expressly limited by statute to whether the award "was not supported by substantial evidence" and the factual findings "support the . . . award."  (§ 5952, subds. (d), (e).)  Indeed, section 5952 expressly provides that "[n]othing in this section shall permit the court . . . to exercise its independent judgment on the evidence."

The WCJ's findings of fact, and the Board's adoption of them, "are final and conclusive and not subject to appellate review if supported by substantial evidence in light of the entire record.  [Citations.]  Substantial evidence must be reasonable in nature, credible, and of solid value such that a reasonable mind might accept it as adequate to support a conclusion.  [Citation.]  In examining the entire record, this court 'may not simply isolate evidence which supports or disapproves the board's conclusions and ignore other relevant facts which rebut or explain the supporting evidence . . . .' "  (*County of Kern v. Workers' Comp. Appeals Bd.* (2011) 200 Cal.App.4th 509, 516-517; see *Braewood Convalescent Hospital v. Workers' Comp. Appeals Bd.* (1983) 34 Cal.3d 159, 164.)

Substantial evidence supported the WCJ's finding that Elavil and Vicodin, prescribed for Clark's industrial injury, *contributed* to his death.  While the level of Elavil could not have been independently fatal, Dr. Bruff testified that it had a contributory effect.  As noted, Bruff testified Elavil "may have had a small role at the levels found," "could be an incremental contributor," and was "additive." Although he could not assign an exact percentage of contribution, Bruff affirmed "[i]t's not zero . . . ."  He further agreed with plaintiffs' counsel's statement that "[w]e can't rule out that the [Elavil] might have been what just put it over the edge to cause this poor man's death at thirty-[six] years old."  Even if it was possible that Clark might have died from an overdose of Xanax and Ambien alone, there also existed a reasonable probability that the Elavil made Clark's death more

14

likely. Similarly with respect to Vicodin, Dr. Bressler stated in his report that the "specific combination of medicines" Clark had ingested, including Vicodin, "all separately and in combination had the capacity to induce respiratory depression, and even respiratory arrest." Bressler further reasoned that Clark's reports of blacking out showed these drugs caused "untoward synergistic respiratory depression and/or central nervous system depression prior to the date of death." Thus, Bressler not only concluded that the drugs could have caused Clark's death, but contributed to a respiratory or nervous system condition that ultimately led to his demise. Bruff testified Vicodin was "potentially a cause" and stated "it's like you have a big twelve inch pie and a couple little crumbs off the crust are due to the Vicodin." This testimony referenced Bruff's earlier statements concerning the causation "pie" and appeared to concede that Vicodin was, in fact, part of that "pie."

This situation is analogous to that of the cigarette-smoking firefighter in *McAllister* and the addiction-prone secretary in *Ballard*. In light of the evidence, the WCJ could reasonably find that Elavil and Vicodin increased the likelihood of death by drug overdose. Under these circumstances, those two drugs could be found to have contributed to Clark's death within the meaning of section 3600. This factual issue was resolved by the WCJ. The evidence on this point was not overwhelming. However, the WCJ resolved the question in favor of the claimant. The Court of Appeal is not free to reweigh the evidence or substitute an inapplicable standard of review.

As noted, in concluding there was no substantial evidence of causation, the Court of Appeal reasoned that if Elavil "played a role at all, it was not significant such that it constituted a material factor contributing to Brandon's death." In support of its application of a "material factor" standard, the Court of Appeal cited only a single practice guide. In describing the necessary proof of causation in a

15

death case, the practice guide stated: "[T]he industrial injury need not be the sole cause of the employee's death to qualify the employee's dependents for death benefits. So long as the industrial injury and employment generally constituted material factors in contributing to the employee's death, the proximate cause test of LC §3600 is met." (1 Dobrin et al., Cal. Workers' Compensation Law and Practice (6th ed. 2002) § 11:04, p. 11-4.)[3] For *this* proposition, the practice guide cites only *Pacific Gas & Elec. Co. v. Ind. Acc. Com.* (1961) 56 Cal.2d 219, 221-223 (*PG&E*). (See also 1 Dobrin et al., § 6:10, p. 6-6 [applicant must show "some material contribution of the employment to the condition or death"].)

*PG&E* lends no support for a material factor standard that is different from, or more stringent than, the contributing cause standard often articulated in our precedents. Indeed, *PG&E* did not involve a question of causation at all, and at no time employed the term "material." In that case, the worker, who had a preexisting nonindustrial carcinoma, suffered a back injury at work. The worker later died and his family was awarded a death benefit. The evidence established that "while the industrial injury brought about the death sooner than it would otherwise have occurred, and was thus one of the proximate causes of death, if there had been no injury the carcinoma would of itself probably have resulted in the employee's death within a year after its actual occurrence." (*PG&E, supra,* 56 Cal.2d at p. 221.) The employer did not "question the finding that the industrial injury was a proximate cause of the death or that the dependents were for that reason entitled to an award of death benefits" (*ibid*.), and the sole issue was whether the death benefits must be apportioned between the industrial and nonindustrial causes. *PG&E* concluded death benefits were not apportionable.

---

[3] The Court of Appeal actually quotes from an earlier edition of the practice guide (Dobrin), but the relevant portion has not been changed between editions.

16

While some older cases have used the phrase "materially contribute" in passing, they have in no way suggested they were employing a different test from the contributing cause standard recognized in *Kimbol*. For example, in *Travelers Ins. Co. v. Ind. Acc. Com.* (1949) 33 Cal.2d 685, we upheld a death benefit where the worker died of meningitis. The question was whether industrial lead poisoning contributed to the death, either by causing the disease itself or accelerating its effect. The court concluded substantial evidence supported the award: "Reading the physician's testimony as a whole, it clearly appears that, as a scientist, in view of the impossibility of testing the blood at the autopsy, he was unwilling to state as a certainty that Odello had lead poisoning; on the other hand, in view of the evidence of lead deposits in Odello's body and the symptoms related by his wife, it was the doctor's opinion that lead poisoning could not be ruled out as a contributing cause of death. . . . Considering the testimony of Dr. Duggan as a whole, the trier of fact reasonably could find that, in the physician's opinion, Odello probably was suffering from lead poisoning at the time he contracted meningitis and such poisoning was a *material* contributing cause of death." (*Id*. at pp. 687-688, italics added.) At least two other cases have made similar statements in passing. (See *Ferreira, supra,* 38 Cal.App.3d at p. 126; *Industrial Indem. Co. v. Ind. Acc. Com.* (1949) 90 Cal.App.2d 262, 263, 265.)

None of these cases expressly considered or decided the issue of what causation standard applied and, thus, cannot be read as creating a higher causation level than the long-established contributing cause test of *Kimbol*. The Court of Appeal reasoned that even if Elavil "played a role" in Clark's death, the evidence of causation was insubstantial because "it was not significant such that it constituted a material factor contributing" to his death. In doing so, it appeared to

17

use the term "material" as a further substantive hurdle in determining whether a work injury was a contributing cause of death. No authority supports such use.[4]

The Court of Appeal's analysis emphasized Dr. Bruff's inability to offer a precise percentage figure for Elavil's contribution to Clark's death. In rejecting a similar argument, *McAllister* reasoned: "Of course, such a detailed account would have been desirable, but it was not a prerequisite to recovery. Such a burden on applicants would often be unbearable. The exact amount and kinds of pollutants inhaled by decedent could only be known if a chemist had gone with him to each fire over his 32 years as a fireman. The precise toxicity of each type of pollutant, alone or in combination with others, is still not known." (*McAllister, supra,* 69 Cal.2d at p. 417.) The court thus reasoned that "[i]n order to cover such unavoidable uncertainties, we require applicants to establish no more than that industrial causation is reasonably probable." (*Ibid*.)

That standard was met here. The autopsy and Dr. Bressler's report both attributed the cause of Clark's death to the combination of all sedative drugs in Clark's system. Bressler concluded that all of these drugs "separately and in combination had the capacity to induce respiratory depression, and even respiratory arrest." Even while repeatedly minimizing Elavil's contribution to the

---

[4]    The employer cites two workers' compensation case summaries that employ the phrase "material factor." (See *West v. Workers' Comp. Appeals Bd.* (1998) 63 Cal. Comp. Cases 1203; *Fickes v. Workers' Comp. Appeals Bd.* (1983) 48 Cal. Comp. Cases 484.) The persuasive value of such summaries is debatable. As the court in *County of San Bernardino v. Workers' Comp. Appeals Bd.* (2012) 203 Cal.App.4th 1469 observed, such decisions "have no precedential value in any case" but may be cited "to the extent that they point out the contemporaneous interpretation and application of the workers' compensation laws by the Board." (*Id*. at p. 1473, fn. 2.) Even so, they are no more illuminating than the cited cases. They include no citation to authority, use the phrase in passing, and do not include the Board's relevant reasoning.

death, Dr. Bruff also repeatedly agreed that it could have combined with the effects of the other drugs to cause death. Under these circumstances, Bruff's failure to provide a precise percentage for Elavil's contribution did not render evidence of causation insubstantial. As discussed, substantial evidence reflected that both Elavil and Vicodin contributed to Clark's death.

The WCJ alternatively found industrial causation because Clark's personal doctor prescribed Ambien to address his inability to sleep due to the pain from his work injury. There is no dispute that Ambien contributed to Clark's death. Dr. Bruff reported that the Ambien level in Clark's body was "10 to 15 times higher than normal dosage levels" and concluded that "this additive effect of [Ambien] and [Xanax] . . . caused sedation significant enough to result in the events leading to his death." Clark's wife testified Clark took Ambien because he had trouble sleeping. Before receiving his Ambien prescription, Clark told his workers' compensation doctor that he "uses the pain medication mostly at night to help him get comfortable for sleep." It is undisputed that Clark continued to experience pain, ultimately receiving two epidural injections in an attempt to mitigate these symptoms. Those injections caused "blacking out," which Dr. Bressler described as probable warning episodes of "untoward synergistic respiratory depression."

Substantial evidence supported this alternative finding as well. As noted, injury or death resulting from medical treatment of a work injury is compensable, and "[t]his rule applies whether the treatment is provided by a physician selected by the employee or by the employer or the employer's compensation carrier." (1 Hanna, Cal. Law of Employee Injuries and Workers' Compensation (rev. 2d ed. 2014) Injuries From Employer's Medical Treatment, § 4.66[1][a], p. 4-88.) Again, the evidence is open to interpretation. However, on the present record, the WCJ could reasonably conclude that Clark could not sleep because his injury caused discomfort. Accordingly, his prescription for Ambien, and his later drug

19

overdose, were causally related to his work injury.  (See *Maher, supra,* 33 Cal.3d at pp. 735-738; *Ballard, supra,* 3 Cal.3d at pp. 837-839.)

In conclusion, our Constitution vests the Legislature "with plenary power . . . to create, and enforce a complete system of workers' compensation." (Cal. Const., art. XIV, § 4.)  It is within the Legislature's exclusive province to specify the causation standard required for compensation.  The Legislature has not articulated a more stringent standard for death claims than disability claims.  (See § 3600, subd. (a).)  As *PG&E* reasoned, "it is not the function of a court to extend legislative provisions into a field to which it appears plainly that the Legislature has chosen not to make them applicable."  (*PG&E, supra,* 56 Cal.2d at p. 222; see *Sumner v. Workers' Comp. Appeals Bd.* (1983) 33 Cal.3d 965, 973, fn. 11.) Similarly, we may not break from long-standing precedent to apply a higher proximate cause standard to death cases when the Legislature has not seen fit to do so.

### III.  DISPOSITION

We reverse the Court of Appeal's judgment.


**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

20

**Name of Opinion** South Coast Framing, Inc. v. Workers' Compensation Appeals Board
_____

**Unpublished Opinion** XXX NP opn. filed 12/9/13, 4th Dist. Div. 1
**Original Appeal**
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S215637
**Date Filed:** May 28, 2015
_____

**Court:**
**County:**
**Judge:**

_____

**Counsel:**

Bradford & Barthel and Louis A. Larres for Petitioners.

Law Offices of Allweiss & McMurty and Michael A. Marks for California Workers' Compensation Institute as Amicus Curiae on behalf of Petitioners.

No appearance for Respondent Workers' Compensation Appeals Board.

Law Offices of O'Mara & Hampton and Daniel J. Palasciano for Respondent Jovelyn Clark.

Smith & Baltaxe, Bernhard D. Baltaxe; Law Offices of Robert W. Willyard and Robert E. Willyard for California Applicants' Attorneys Association as Amicus Curiae on behalf of Respondent Jovelyn Clark.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Louis A. Larres
Bradford & Barthel
1300 East Shaw Avenue, Suite 171
Fresno, CA  93710
(559) 221-6500

Daniel J. Palasciano
Law Offices of O'Mara & Hampton
2370 Fifth Avenue
San Diego, CA  92101-1611
(619) 239-9885

Bernhard D. Baltaxe
Smith & Baltaxe
825 Van Ness Avenue, Suite 502
San Francisco, CA  94109
(415) 292-7800